**FLAGSTAFF MEDICAL CENTER, INC., Plaintiff,**

**v.**

**Louis W. SULLIVAN, Secretary of Health & Human Services, Defendant.**

**Nos. CIV 88–1881–PCT–CAM, CIV 89–0576–PCT–CAM.**

United States District Court, D. Arizona.

Aug. 22, 1991.

Susan Slasor, Coconino County Legal Aid, Michele Melden & Laura Rosenthal, National Health Law Program, for plaintiffs Elizabeth Mazon, Leon Salazar, Jack Sabo, Maria Sandoval, Ruth Havatone, Quade Uqualla, and Aurora Petty, individually and on behalf of all other persons similarly situated.

Sheila Lieber & Tracy L. Merritt, Civ. Div., U.S. Dept. of Justice, for defendant Louis W. Sullivan, Secretary of Health and Human Services.

Daniel J. Stoops, Mangum, Wall, Stoops & Warden, for defendants Flagstaff Medical Center & Flagstaff Health Management Corp.

## AMENDED MEMORANDUM and ORDER

MUECKE, District Judge.

The following Amended Memorandum and Order is issued pursuant to the court's Order of August 22, 1991, which addressed defendant Flagstaff Medical Center's motion to clarify and other clerical errors contained in the initial Memorandum and Order filed August 9, 1991. The Amended Memorandum and Order contains no sub-

stantive changes from the Memorandum and Order filed August 9, 1991.

The court has carefully reviewed and considered the parties' cross-motions for summary judgment and the oral argument presented to the court, and concludes as follows:

## INTRODUCTION

"An aura of inevitably is upon us. It is no longer acceptable morally, ethically, or economically for so many of our people to be medically uninsured or seriously underinsured."[1] Such was the conclusion of a recent editorial in The Journal of the American Medical Association. Indeed, the Journal considers the problem of uninsured and underinsured to be so critical that it devoted an entire issue to the access to health care crisis in this country. *See The Journal of the American Medical Association*, Vol. 265, No. 19 (May 15, 1991).

"Many crises are born of a series of small events that one day reach critical mass." Friedman, E., "The Uninsured: From Dilemma to Crisis," *Id.* at 2493. So it has been with the uninsured and underinsured. Although Americans spend more on health care per capita than any other country in the world,[2] serious problems concerning access to health care remain. Bobinski, Mary A., "Unhealthy Federalism: Barriers to Increasing Health Care Access for the Uninsured," 24 *U.C. Davis L.Rev.* 255, 257 (1990). Estimates of Americans lacking any type of insurance coverage (public or private) place the number between 31 and 36 million. Friedman, *supra*, at 2491. These estimates represent approximately thirteen to fifteen percent of the population. Almost as many or more may be underinsured. Bobinski, *supra*, at 262–63.

Clearly, "access to basic medical care for all our inhabitants is still not a reality in this country." *Journal of American Medical Association, supra*, at 2566. Although the current health care crisis is one that must be addressed by the legislative and executive branches of our government, the court believes it is necessary to acknowledge the crisis in order to understand adequately the context of the current litigation.

## BACKGROUND

This case is a consolidated matter involving indigent access to health care under the Hill–Burton Act. 42 U.S.C. § 291, *et seq.* The Hill–Burton Act (named after its Senate sponsors, Lister Hill and Harold H. Burton), officially known as the 1946 Hospital Survey and Construction Act, was one of four major postwar medical programs.[3]

Hill–Burton was the result of a plan for postwar hospital construction developed by the American Hospital Association. Shortly before the war ended, the American Hospital Association "decided to organize a national commission (Commission on National Health Care) to develop—or, perhaps more accurately, to develop support for—a national program for hospitals." Starr, *The Social Transformation of American Medicine* 348 (1982). The Commission, as might be expected, recommended a huge program of hospital construction. *Id.* at 341. Advocates of Hill–Burton originally argued that the program would help provide access to health care for families and communities that otherwise could not afford the cost. The allocation of funds favored those with low per capita income, and, in this regard, the law was redistributive. *Id.* at 350. Although proposals during the late 1940s favored the financing of comprehensive medical services, the mea-

---

1. *The Journal of the American Medical Association*, Vol. 265, No. 19, at 2566 (May 15, 1991).

2. "In 1988, health care spending in the United States reached $539.9 billion, representing an average expenditure of $2,124 per person." Bobinski, Mary A., "Unhealthy Federalism: Barriers to Increasing Health Care Access for the Uninsured," 24 *U.C. Davis L.Rev.* 255, 260 (1990).

3. The other three programs involved medical research, mental health, and the VA system. All four programs were characterized by a pattern that acknowledged the sovereignty of the medical profession and local medical institutions. Starr, *The Social Transformation of American Medicine* 351 (1982).

sures adopted put the power of finance behind hospitals alone. *Id.* at 348.

The purpose of the Hill–Burton Act was to assist states in "furnishing adequate hospital, clinic, or similar services to all their people." Pub.L.No. 79–725, § 601, 60 Stat. 1040, 1041 (1946). The Act provided federal grants, and later loans, loan guarantees, and interest subsidies for hospital construction and modernization. 42 U.S.C. § 291a. Under the Hill–Burton Act, health care facilities could not receive hospital construction funds unless the facilities provided an assurance that

> there will be made available in the facility or portion thereof to be constructed or modernized ... a reasonable volume of services to persons unable to pay therefor. ...

*Id.* § 291c(e)(2). This assurance became known as the "reasonable volume" or "uncompensated care" assurance. *American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 173 (7th Cir.1983), *cert. denied, sub nom., American Hosp. Ass'n v. Heckler*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984).[4]

Although the Hill–Burton Act tied the funding of hospital construction to a commitment by the hospital to provide uncompensated care to indigent persons, the provision of such care was largely an illusion. In great part, this was due to the fact that for the first twenty-six years of the Act, "enforcement of the Hill–Burton Act's uncompensated care ... assurances existed only in precatory, exhortative language." Blumstein, J., "Court Action, Agency Reaction: The Hill–Burton Act as a Case Study," 69 *Iowa L.Rev.* 1227, 1238 (1984). The regulations issued between 1947 and 1974 essentially tracked the language of the statute. During this period, "the hospitals receiving aid displayed a marked reluctance to give even the most token charitable care." *American Hosp. Ass'n*, 721 F.2d at 170; *see* Comment, "Provision of Free Medical Services by Hill–Burton Hospitals," 8 *Harv.C.R.–C.L.L.Rev.* 351, 352 (1973). Indeed, the Senate Committee on

Labor and Public Welfare, in reviewing the Hill–Burton enforcement experience, concluded that federal and state agency compliance efforts reflected a "sorry performance." S.Rep. No. 1285, 93d Cong., 2d Sess. 61, *reprinted* in 1974 U.S.CODE CONG. & ADMIN.NEWS 7842, 7900. Widespread non-compliance by many hospitals and the inability or unwillingness of the Department of Health and Human Services ("HHS") (and its predecessor agency, Health, Eduction and Welfare) to ensure hospital compliance resulted in the denial of a basic necessity of life for many indigent patients during this period.

In response to a series of lawsuits, *see, e.g., Euresti v. Stenner*, 458 F.2d 1115 (10th Cir.1972); *Cook v. Ochsner Foundation Hosp.*, 61 F.R.D. 354 (E.D.La.1972), the Secretary in 1972 began to issue regulations that defined standards for compliance with the assurances. These regulations, among other things, defined a "reasonable volume of services" and "persons unable to pay," and established standards for compliance and initiated various reporting requirements. *American Hosp. Ass'n*, 721 F.2d at 173.

In 1975, Congress enacted a new federal assistance program for health care facility construction and modernization that replaced Title VI, the title that covered Hill–Burton. 42 U.S.C. § 300q *et seq.* This later Act, which added Title XVI to the Public Health Service Act, provides for assurances similar to those in Title VI but adds teeth to the Hill–Burton Act's requirements as well. Title XVI grants the Secretary of Health and Human Services extensive investigative and enforcement powers over facilities assisted under both Title VI and Title XVI of the Public Health Service Act. *id.* at § 300s–6. "Apparently in recognition of the compliance problems which had arisen under the Hill–Burton program, Title XVI mandates, rather than permits, the Secretary to prescribe by regulation," *American Hosp. Ass'n*, 721 F.2d at 174,

---

**4.** In addition to providing a reasonable volume of services to persons unable to pay, a facility is required to satisfy what is known as the "community services" assurance. Under this assurance, a facility agrees to make its facility available to all persons residing in the facility's service area. 42 U.S.C. § 291c(e)(1); *American Hosp. Ass'n*, 721 F.2d at 173.

the general manner in which each entity which ... has received financial assistance under [either Title XVI] or [Title VI] shall be required to comply with the assurance required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances.

42 U.S.C. § 300s(3).

In response to the congressional mandate, the Secretary of HHS (then, Health, Education and Welfare) in 1979 adopted regulations [5] that, among other things, set health care facilities' uncompensated care obligations at specific levels,[6] established eligibility criteria for indigent patients, and required facilities to make eligibility determinations within two days of a request for services. 44 Fed.Reg. 29,372–409 (May 18, 1979). Under the 1979 regulations, facilities could not obtain credit toward their uncompensated care obligations in cases in which they failed to make eligibility determinations within two days of a request. 42 C.F.R. § 124.508(a) (1979). According to the preamble of the finalized regulations, "[c]lear recordkeeping requirements are ... established to avoid the current problem of distinguishing between uncompensated services qualifying for credit and 'bad debts,' 'courtesy allowances' and other writeoffs that do not qualify." 44 Fed. Reg. 29,374 (May 18, 1979).

In 1987, HHS substantially revised the 1979 regulations. HHS revised the timing requirements for eligibility determinations by retaining the two-day requirement for requests for services made *before* admission or treatment, but eliminating the two-day requirement in situations where liability for the cost of the services *has already been assumed* by the provider. 42 C.F.R. § 124.507 (1990). The timing requirement for eligibility revision was part of a new standard, "substantial compliance," adopted by HHS under which facilities would be denied credit only in a limited number of circumstances. *See* 42 C.F.R. § 124.511(b)(1) & 124.512(c) (1990). In effect, under the new regulations, a facility that substantially complies with the more important regulatory requirements can receive full credit for the claimed uncompensated services, despite failure to comply in particular cases. If, however, an institution systematically fails to comply with an important requirement, it may lose Hill–Burton credit for the entire year, including credit for accounts that are otherwise eligible. *Id.*

Following the adoption of the 1987 regulations, HHS implemented an "interpretative change" to revoke retroactively the effect of the 1979 two-day rule. HHS' revised interpretation was published in the Federal Register, effective November 7, 1988. Under the 1988 interpretative change, HHS decided to reinstate credit to all facilities denied credit between 1980 and 1988 for failing to give timely determinations. *See* 53 Fed.Reg. 44,954–55 (Nov. 7, 1988). This change resulted in the reinstatement of $31 million to facilities nationwide. Plaintiffs' Response to Federal Defendant's Motions for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion as to HHS"), Statement of Facts ("SOF"), at para. 24. This amount, had it not been reinstated, would have been available for uncompensated care for indigent patients.

HHS' revised interpretation was prompted by two events. First, according to HHS, the substantial compliance standard adopted by HHS on December 3, 1987, substantially revised both the timing requirements for eligibility determinations and the enforcement scheme. The new regulations, according to HHS, "rendered moot for most purposes" the issue of compliance with the two-day working requirement. 53 Fed.Reg. 44,955 (Nov. 7, 1988). The second event was a decision by the District Court

---

**5.** The 1979 regulations apply to health care facilities receiving assistance under both the Hill–Burton Act (Title VI) and Title XVI. 42 C.F.R. § 124.501(a) (1979).

**6.** The levels established by the regulations required hospitals to provide uncompensated services equivalent to either 3% of the hospital's operating costs or 10% of the federal assistance the facility had received, whichever is less. 42 C.F.R. § 124.503(a)(1).

for the District of Minnesota, *Douglas County Hosp. v. Bowen,* (No. 6–85–1078) (D.Minn., Aug. 3, 1988).[7]

### The Parties

Plaintiff class ("Mazon") consists of all persons who have resided, are presently residing or will reside in Coconino County and, who have been, are being or will be denied Hill–Burton uncompensated care by Flagstaff Medical Center ("FMC" or "Flagstaff"). First Amended Complaint, at para. 18. Defendants consist of FMC and HHS. In the first action (CIV No. 88–1881–PCT–CAM), FMC sued HHS, challenging HHS' decision to disallow credit towards Flagstaff's Hill–Burton obligation for uncompensated services allegedly provided by the hospital during fiscal year 1980. The parties filed a stipulated dismissal with prejudice of this action on January 22, 1990.

The second action (CIV No. 89–0576–PCT–CAM) was filed by the Mazon plaintiffs against both FMC and HHS. As to Flagstaff, the Mazon plaintiffs claim that the hospital failed to provide uncompensated care in violation of the Hill–Burton Act, its regulations, and other federal and state laws. As to HHS, plaintiffs challenge the revised interpretation of the two-day eligibility determination regulation that required the denial of credit when a facility failed to make an eligibility determination within two days. Plaintiffs also challenge HHS' "interpretative change" that reinstated credit to all facilities.

### DISCUSSION

#### *Mazon Plaintiffs v. HHS*

Plaintiffs challenge two regulatory changes adopted by HHS. First, as discussed earlier, they challenge HHS' abandonment of the 1979 regulation's requirement of automatically denying credit in each case in which a facility failed to make a timely two-day determination. In particular, they challenge the adoption of the "substantial compliance" standard under which facilities would be denied credit only in a limited number of circumstances. 52 Fed.Reg. 46,022–39 (Dec. 3, 1987). According to plaintiffs, this new standard allows facilities to take credit for care provided without making timely eligibility determinations. Plaintiffs' Motion as to HHS, at 2.

Second, plaintiffs challenge HHS' 1988 "interpretative change" published in the Federal Register without formal rulemaking that reinstated credit to all facilities that had been denied credit between 1980 and 1987 for violating the 1979 timely determination requirements. 53 Fed.Reg. 44,954–56 (Nov. 7, 1988). According to plaintiffs, the 1987 regulations and the 1988 interpretative change are inconsistent with the Hill–Burton Act, violate the Administrative Procedure Act ("APA"), and conflict with due process standards.

### I. *Standard of Review*

To grant summary judgment the court must determine that there is "no

---

**7.** The *Douglas County* Court issued two orders that are relevant to this matter. The first decision, the Order of December 23, 1987, 1987 WL 113752 (*"Douglas I"*), held that facilities requiring brief delays beyond the two-day limit stated in the regulations to verify income eligibility could still receive Hill–Burton credit. The eligibility determination in question took four rather than two days. *Douglas I,* Order of December 23, 1987, at 13. The *Douglas* Court left the holding of *Corum v. Beth Israel Medical Center,* 373 F.Supp. 550 (S.D.N.Y.1974) and its "progeny" intact except for the limited flexibility in the two-day rule:

> Unlike *Corum* and its progeny, where the facilities had no valid reason justifying a lengthy delay before making eligibility determinations, Douglas County has apparently caused brief delays for the purpose of verify-

ing patients' eligibilities. This procedure addresses the *Corum* court's concern for the discouraging effect caused by a patient's uncertainty about his ultimate eligibility, thus supplying the "valid reason" for delay the *Corum* court found lacking.

*Id.* at 12–13.

In the second decision, the *Douglas* Court held that the denial of credit for failure to comply with the two-day rule is an inappropriate remedy in that it is inconsistent with the regulations. Order of August 3, 1988, at 6–7 (*"Douglas II"*).

The *Douglas* Court's decision was limited to the situation whereby HHS sought to deny credit to facilities who required a "brief delay" in determining eligibility. It is inapplicable to the extent that there is more than a brief delay or a brief delay that is unsupported by any "valid reason."

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to prove that there is no material fact and that she is entitled to judgment as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence presented by the moving party must be more than a mere scintilla; it must be probative enough that a fair-minded jury could return a verdict for the moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The party opposing a motion for summary judgment must set forth more than mere allegations or denials; the response must include specific facts demonstrating a genuine issue for trial. *Id.* at 248, 106 S.Ct. at 2510; Fed.R.Civ.P. 56(e).

 Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249, 106 S.Ct. at 2510. The dispute must also be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted).

## II. *Standing and Private Right of Action*

 HHS argues that plaintiffs have failed to meet the constitutional prerequisites for standing. HHS' Supplemental Memorandum, at 2. HHS also argues that plaintiffs do not have a private right of action under the Hill–Burton Act. HHS' Motion for Summary Judgment on Claims Raised in Plaintiffs' First Amended Complaint ("HHS Motion as to First Amended Complaint"), at 3. Since standing is a jurisdictional prerequisite to the case or controversy requirement of Article III of the Constitution, it must first be determined whether plaintiffs have standing to present the question of statutory interpretation of whether a private cause of action exists against HHS. *See Gillis v. U.S. Dept. of Health and Human Services*, 759 F.2d 565, 570 n. 5 (6th Cir.1985).

 "Article III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quotations and citations omitted); *American Arab Anti-Discrimination Committee v. Nelson*, 940 F.2d 445, 449 (9th Cir.1991). Section 10 of the APA confers standing to obtain judicial review of agency action upon those who can show "that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests [8] to be protected or regulated' by the statutes that the agencies were claimed to have violated." *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *United States v. Students Challenging*

---

**8.** The "zone of interests" test is a prudential requirement. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757–58 n. 16, 93 L.Ed.2d 757 (1987). As the Supreme Court noted:

The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency deci-

sion.... The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. at 757 (citations and footnotes omitted). The "zone of interest" test "is most usefully understood as a gloss on the meaning of § 702 [of the APA]." *Id.* at 400 n. 16, 107 S.Ct. at 757 n. 16.

*Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973); *Lujan v. National Wildlife Federation,* — U.S. ——, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990). "A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." *SCRAP,* 412 U.S. at 688–89, 93 S.Ct. at 2416.

 HHS argues that any injury plaintiffs assert as a result of the 1987 substantial compliance standard "is too remote and speculative to sustain standing." HHS' Supplemental Memorandum, at 3. They further argue that plaintiffs have not been injured by the application of the 1988 interpretative rule to Flagstaff. *Id.* at 8.

Plaintiffs are the beneficiaries of the Hill–Burton program at Flagstaff Medical Center. First Amended Complaint, at 18. This is not contested by HHS. Plaintiffs' claim that HHS exceeded the permissible bounds of regulation clearly is within the zone of interests protected by the Hill–Burton Act. *See Colonial Penn Ins. Co. v. Heckler,* 721 F.2d 431, 435 (3rd Cir.1983) (insurance company complaining of regulations that made it primarily liable for medical benefits despite policy provision making it secondarily liable was within zone of interest protected by statute underlying the regulation). In addition, the zone of interests test must be applied "in view of Congress' evident intent to make agency action presumptively reviewable." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. The test "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Id.* at 397 n. 12, 107 S.Ct. at 756 n. 12. Here, it is clear that plaintiffs' action, by claiming that HHS' two administrative decisions deny them uncompensated medical care, is intended to further one of Hill–Burton's primary objectives: to provide a reasonable volume of free care to those unable to pay.

Finally, the court is persuaded that plaintiffs have alleged the requisite "injury in

fact." Assuming plaintiffs' allegations are true and capable of proof at trial, HHS' actions in issuing the 1987 regulations and the 1988 interpretative rule injured plaintiffs by reducing the total amount of free care FMC must provide. For example, HHS admits that FMC was relieved of $85,-245 in uncompensated care as a result of the 1988 interpretative change. HHS' Supplemental Reply, at 6. If the court invalidates the 1988 interpretative rule, plaintiffs will have in effect suffered an injury in the amount of $85,245. This injury is hardly speculative. It is irrelevant, as HHS asserts, that FMC exceeded its obligation "by $183,672, and therefore plaintiffs were not harmed by virtue of the 1988 change." *Id.* at 7. This assertion is directed to the mootness and, to a certain extent, the merits of plaintiffs' claim. It has nothing to do with whether plaintiffs have or will suffer an injury as a result of the 1988 interpretative change.

Also, should the court invalidate the 1987 regulations—which no longer require denial of credit when a facility fails to make an eligibility determination within two days— plaintiffs arguably could have suffered an injury in fact for the amount of care given by FMC between March 12, 1990, and April 30, 1990.[9] HHS responds by arguing that plaintiffs' claim of injury is premised on assumptions that FMC failed to make determinations of eligibility within two days and is contingent upon acceptance of plaintiffs' "erroneous interpretation" of HHS' regulations. HHS' Supplemental Reply, at 4–5. HHS' argument is directed to the merits of plaintiffs' action and not the question of standing. Such arguments do no more than "trivialize the standing doctrine." *Valley Forge Christian College,* 454 U.S. at 514, 102 S.Ct. at 780 (Stevens, J., dissenting). Contrary to HHS' assertion, plaintiffs are not asking the court to assume that FMC has failed to make eligibility determinations within two days. Rather, plaintiffs claim that the 1987 regulations (substantial compliance standard), by not automatically denying credit when a

---

**9.** During this period FMC provided care in the amount of $531,643 and was assessed pursuant to the 1987 substantial compliance standard. Plaintiffs' Supplemental Response, at 4.

facility fails to follow the two-day rule, is inconsistent with one of Hill–Burton's primary objectives: to provide uncompensated care to indigent people. Whether the 1987 regulations are consistent with Hill–Burton has little to do with whether FMC actually complied with the two-day rule, for what is at issue here is the result of such failure; namely, if, in order to be consistent with the Act, automatic denial of credit is required, or if failure to follow the two-day rule may just be one factor in determining whether a facility has substantially complied with the Act's requirements.[10]

Finally, HHS asserts that "even *if* Flagstaff, in the future, fails to provide determinations of eligibility within two working days (where a request for care is made prior to service), plaintiffs assume that this failure would discourage indigent patients from seeking care." HHS' Supplemental Reply, at 5–6. How this assertion relates to the question of standing is unclear, especially in light of plaintiffs' claim that the 1987 regulations are inconsistent with Hill–Burton. Also, HHS's assertion appears to be premised on a notion that even if the court invalidated the 1987 regulations and found that FMC failed to provide eligibility determinations within two days, there would still be no injury because it is not certain that such a finding would discourage plaintiffs from seeking care. In other words, it is not certain that, even if the court finds that FMC failed to follow the two-day rule, any benefit will have been realized by plaintiffs.

In *Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981), the Supreme Court found that the State of California had standing to assert that the Secretary of Interior failed to follow a statutory mandate to test different royalty systems in leasing offshore gas and oil production rights. The Secretary argued that standing should be denied because even if California prevailed, the Secretary could still use the same royalty system on parcels leased off the California coast. The Court held that California had standing, finding that the injury was caused by the Secretary's failure to experiment with other royalty systems. *Id.* at 162, 102 S.Ct. at 213. The Court based its finding on the fact that if the Secretary found, after experimentation, that another royalty system was more profitable, it could safely be assumed that that system would be applied to the leases off California. *Id.* In the instant case, as in *Watt,* it might be that plaintiffs might in fact receive no benefit. However, that is not sufficient to deny them the opportunity to receive the benefit. If this court were to deny plaintiffs' standing, it would in effect be denying plaintiffs the opportunity—regardless of whether there is a correlation between the two-day rule and the seeking of care—to obtain uncompensated medical care.

In short, the court is persuaded that plaintiffs have standing to maintain this action. They have alleged an injury in fact that stems from a final agency action, and the alleged injury is arguably within the zone of interests protected and/or regulated by the Hill–Burton Act.

 Having concluded that plaintiffs have standing, the court must now consider—before reaching the merits of plaintiffs' claim—whether plaintiffs have a private right of action under the Hill–Burton Act.[11] The Act itself does not expressly

---

**10.** This also is true for HHS' assertion that "even if this Court were to order Flagstaff to provide additional uncompensated care, the plaintiff class could only be injured *if* the 1987 'substantial compliance' standard proves to be such a poor enforcement mechanism that Flagstaff would violate the specific timing requirements set forth at 42 C.F.R. § 124.507." HHS' Supplemental Reply, at 5. HHS again argues the merits of plaintiffs' claims. Whether the 1987 regulations are a "poor enforcement mechanism" relates to whether the "substantial compliance" standard is consistent with Hill–Bur-

ton; it has little to do with whether plaintiffs have alleged an injury in fact for it clear that if the 1987 regulations are invalidated, then plaintiffs have suffered an actual injury. Contrary to HHS' implication, plaintiffs need not establish an actual injury before being allowed to proceed.

**11.** The following discussion also applies to HHS' assertion that plaintiffs may not maintain a private right of action under the Administrative Procedure Act because plaintiffs merely challenge the Secretary's enforcement discre-

grant a right of action against the Secretary. Rather, the statute provides that an individual may bring an action against a *facility* to effectuate compliance after filing an administrative complaint with the Secretary if the Secretary dismisses the complaint, or the Attorney General fails to bring a civil action for compliance within six months. 42 U.S.C. § 300s–6.

HHS argues that plaintiffs have no private right of action under the Hill–Burton Act "to challenge the Secretary's alleged failure to meet his enforcement obligations under the Act." HHS Motion as to First Amended Complaint, at 3. Defendants rely on two cases that hold that the Hill–Burton Act provides no express or implied private right of action to challenge the Secretary's alleged failure to meet her enforcement obligations under the Act. *Gillis*, 759 F.2d at 573–74; *Davis v. Ball Memorial Hosp. Ass'n*, 640 F.2d 30, 43–47 (7th Cir.1980).

In *Davis*, the Seventh Circuit, in discussing the availability of a private right of action explained that Congress "acting against this backdrop of suits against both state and federal defendants, ... chose to amend the statute to acknowledge a private right of action against the facilities while placing—without any similar acknowledgement—enforcement powers in the Secretary." *Davis*, 640 F.2d at 46; *accord Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (if "Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion"). In *Gillis*, plaintiff class alleged that HHS had failed to monitor and enforce the compliance of hospitals with relevant Hill–Burton provisions relating to uncompensated or reduced cost services. 759 F.2d at 567. The *Gillis* Court agreed with

*Davis, supra*, and found that "to the extent that plaintiffs seek to compel HHS to investigate, ascertain and effect compliance, ... there exists no implied cause of action under Hill–Burton." *Id.* at 574.

Under *Gillis* and *Davis*, indigent patients may not sue the Secretary for failing to bring enforcement actions against hospitals that violate Hill–Burton's requirements.[12] Indeed, this is consistent with the Act's provision that allows an individual to bring an action against a facility to effectuate compliance. 42 U.S.C. § 300s–6. However, the issue here is whether indigent patients may sue the Secretary for enacting regulations that conflict with the statute. Plaintiffs are not suing to compel enforcement. Rather, they claim that the Secretary exceeded his authority by promulgating regulatory changes that conflict with the Hill–Burton statute. *Cf. American Hosp. Ass'n v. Schweiker*, 721 F.2d at 176 (not within Secretary's authority to promulgate regulations that conflict with governing Hill–Burton statute).

To the extent that the Secretary's actions constitute a "final agency action," there appears to be no reason for not allowing the suit to proceed against the Secretary. Indeed, if plaintiffs cannot challenge the issuance of regulations that they claim conflict with the statute, the Secretary's authority would remain virtually unchecked. Plaintiffs' claims are not intended to compel enforcement. Rather, their claims challenge the Secretary's authority to promulgate regulations that conflict with the statute. The mere fact that the new regulations affect the Secretary's enforcement function is, at most, incidental to the issue of whether the Secretary exceeded her authority.[13]

### III. *The Hill–Burton Act*

Having concluded that plaintiffs have standing and a private right of action, the

---

tion. *See* HHS Supplemental Memorandum, at 9–15.

**12.** *Gillis* and *Davis* are consistent with the general principle that agency decisions not to take enforcement action is an *exception* to the strong presumption that all other final agency actions are reviewable. *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714

(1985); *Robbins v. Reagan*, 780 F.2d 37, 44 (D.C.Cir.1985).

**13.** In light of the court's conclusion that plaintiffs do not seek to compel HHS to investigate, ascertain or effect compliance, the court sees no need to apply the analysis set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

next issues to consider are whether HHS' 1987 regulations and 1988 interpretative change violate the Hill–Burton Act. As discussed earlier, the 1987 regulations imposed a "substantial compliance" standard under which facilities would be denied credit only in a limited number of circumstances. 52 Fed.Reg. 46,022–39 (Dec. 3, 1987). In effect, the substantial compliance standard abandoned the requirement of automatically denying credit in each case in which a facility failed to make a timely two-day determination. The 1988 interpretative change reinstated credit to all facilities that had been denied credit between 1980 and 1987 for violating the two-day eligibility determination requirement.

### A. The 1987 Regulations

In *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court articulated the approach a court must take in determining whether an agency's construction of a statute conflicts with the congressional intent underlying the statute:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court simply does not impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [footnotes omitted].

The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. *Morton v. Ruiz*, 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. *Id.* 467 U.S. at 842–44, 104 S.Ct. at 2781–82; *see also, Sullivan v. Everhart*, 494 U.S. 83, ——, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990). The court need not conclude that the agency's construction is the only reasonable interpretation of the statute, or that the court would have reached the same conclusion. The agency's interpretation need only be reasonable and not contrary to congressional intent. *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 1782 n. 11; *Cranston v. Clark*, 767 F.2d 1319, 1323 (9th Cir.1985); *Zarr v. Barlow*, 800 F.2d 1484, 1486 (9th Cir.1986). Although regulations promulgated by agencies charged with administration of statutory law are accorded substantial deference, *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982), a court must reject administrative constructions that are an unreasonable interpretation of the statute or contrary to clear congressional intent. *F.E.C. v. Democratic Senatorial Campaign Comm'n*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (courts must reject administrative constructions of statute, whether reached by rulemaking or adjudication, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement); *Shoemaker v. Bowen*, 853 F.2d 858, 861 (11th Cir.1988) (court noted that it "need not accept an agency's interpretation [of a

statute] that frustrates the underlying congressional policy"); *New York State Dep't of Social Services v. Bowen*, 846 F.2d 129, 134 (2nd Cir.1988) ("The deference ordinarily due the federal agency charged with interpreting a statute is unnecessary and inappropriate ... where HHS's interpretation is not only inconsistent with the language of the ... statute and its purpose, ... but also in defiance of common sense.").

■ An "agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987); *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981). Where an agency changes its course by rescinding a rule or reversing a prior statutory interpretation, it "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1345 (9th Cir.1990). The agency's interpretation, though entitled to deference, must acknowledge and provide a reasonable rationale supporting its departure from its prior views. *Seldovia*, 904 F.2d at 1345; *Mobil Oil Corp. v. E.P.A.*, 871 F.2d 149, 152 (D.C.Cir.1989).

Plaintiffs argue that in enacting Hill–Burton, Congress intended to expand the availability of uncompensated care to indigent persons and that the 1987 regulations are clearly inconsistent with that intent. According to plaintiffs, the substantial compliance standard instituted by the 1987 regulations has the effect of allowing facilities to receive credit for care given without timely eligibility determinations and therefore conflicts with the Hill–Burton Act's intent to expand the availability of uncompensated care. Plaintiffs' Cross–Motion, at

11. This "change in enforcement ... presents a sharp departure from the previous 1979 rule under which facilities would not receive credit *any time* they were found to have failed to give a timely determination." *Id.* at 14 (emphasis in original). HHS responds that the "1987 substantial compliance regulations are clearly a proper exercise of the Secretary's broad authority to administer the uncompensated care assurance under the Hill–Burton Act." HHS' Motion as to First Amended Complaint, at 6. Furthermore, according to HHS, the 1987 regulations created more of an incentive for facilities to comply with the eligibility determination regulations. *Id.* at 8.

As a starting point, it must first be determined whether Congress "unambiguously expressed [an] intent" regarding the question at issue. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781. Although the court agrees that the Hill–Burton Act "was intended to be more than a construction statute" and that the "provision of medical services for the indigent was a major concern among supporters of the bill, ..." *American Hospital Ass'n v. Schweiker*, 721 F.2d at 176–77, neither the plain language of the Hill–Burton Act nor the legislative history provide much guidance as to whether the substantial compliance regulations are consistent with Hill–Burton. The statute merely states that in order for a hospital to receive construction funds, it must provide "a reasonable volume of services to persons unable to pay." 42 U.S.C. § 291c(e)(2). The statute enacted by Congress did not define a "reasonable volume of uncompensated services" nor did it address which services would qualify for "credit" under the Act. Congress also did not address how facilities should demonstrate compliance with the Act's uncompensated care assurances, the relationship between "bad debts" and the Hill–Burton assurances, or the timing of eligibility determinations.

■ Since the Hill–Burton Act is silent or, at the very best, ambiguous, with respect to the issues before the court,[14] the

---

**14.** The absence of any guidance in the statute is not surprising. Hill–Burton, like most modern health legislation, is characterized by highly symbolic legislative statements of aspirations

Court must consider whether there is an express delegation of authority to elucidate by regulation with respect to the substantial compliance regulations. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782. Although it is arguable as to whether an explicit delegation of authority exists in this case, it seems fairly clear that Congress intended, at the very least, an implicit delegation of authority to HHS to render the substantial compliance regulations. The Hill–Burton Act provides in relevant part:

> The Surgeon General ... and the Secretary of Health and Human Services shall by general regulations prescribe—
>
> (e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals ... to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended, ... assurance shall be received by the State from the applicant that ... there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

42 U.S.C. § 291c(e). The Act further states:

> (b) The Surgeon General shall approve such application if sufficient funds to pay the Federal share of the cost of such project are available from the appropriate allotment to the State, and if the Surgeon General finds ... (3) that the application is in conformity with the

State plan approved under section 291d of this title and contains an assurance that in the operation of the project there will be compliance with the applicable requirements of the regulations prescribed under section 291c(e) [dealing with the provision of medical services to "persons unable to pay"].

*Id.* at § 291e(b)(3); *see also, American Hosp. Ass'n v. Schweiker*, 721 F.2d at 176 (Secretary's authority, which is "very broad," requires the issuance of "general regulations" relating to compliance by facilities with the uncompensated care provisions of the Act); *Wyoming Hosp. Ass'n v. Harris*, 727 F.2d 936, 939 (10th Cir.1984) (upholding 1979 regulations as a valid exercise of the Secretary's broad authority under the Hill–Burton Act to promulgate general regulations). In light of the intent expressed by the Act's language and the case law interpreting the language, the court is convinced that Congress did not expressly foreclose the substantial compliance regulations as an interpretation of the Hill–Burton Act.

Finally, having concluded that the substantial compliance regulations are an allowable construction of the Act that was implicitly delegated to HHS, the court must next determine whether HHS' interpretation falls within the boundaries assigned to HHS, i.e., are the substantial compliance regulations a reasonable interpretation of the Hill–Burton Act. Since HHS arguably changed its course by, in effect, rescinding a rule, it "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42, 103 S.Ct. at 2866.

The substantial compliance approach, according to HHS, "is an effort to look at *more* facilities in less time, ensuring more

---

that are often concerned with access to health care. *See* Blumstein & Zubkoff, "Public Choice in Health: Problems, Politics and Perspectives on Formulating National Health Policy," 4 *J. Health Policy & L.*, 382, 388–90 (1979). With statutes such as Hill–Burton, it is not unusual for Congress to leave enforcement gaps and provide the agency with authority to act either

passively or aggressively in the administration of legislation. Blumstein, *supra*, at 1234. The fact that the first set of detailed enforcement regulations were adopted in 1972—over twenty-five years after its enactment—indicates that, at least for the first generation of the Act, Hill–Burton was administered in a passive manner.

enforcement nationwide, and enabling HHS to discern compliance problems at an early stage, benefiting both facilities and potential recipients of uncompensated care." [15] HHS' Motion as to First Amended Complaint, at 9–10. According to HHS, the Secretary, after eight years of administering the program under the 1979 regulations, made a reasonable determination that the "substantial compliance" standard presents a significant "incentive" for a facility to operate its program in conformity with the regulations. 52 Fed.Reg. 46,023 (Dec. 3, 1987). The Secretary found that the account-based approach "skewed the incentive for compliance toward some regulatory requirements and away from others." *Id.* Also, audits of individual accounts "consumed the Department's limited resources, ... lessening its ability to monitor the universe of Hill–Burton facilities for systemic problems of compliance." *Id.* For example, as of September 1988, 1730 facilities out of 3532 had never been assessed for compliance under the 1979 regulations. HHS' Motion as to First Amended Complaint, SOF, at para. 21.

■ Plaintiffs argue that the 1987 "substantial compliance" regulations are inconsistent with the Hill–Burton Act because the regulations permit facilities "to obtain credit for care given without timely [eligibility] determinations." Plaintiffs' Cross–Motion, at 13. Specifically, plaintiffs claim that the 1987 regulations are inconsistent with Hill–Burton insofar as they allow facilities to convert uncompensated services obligations into a means for writing off bad debts. *Id.* at 8. Plaintiffs' argument is based on their assertion that the regulations conflict with the Act's legislative intent. Plaintiffs cite legislative history that shows that when referring to the Act's assurances, the primary objective was to *expand* the availability of uncompensated care to indigent persons. *See* Plaintiffs' Motion, at 6–7. In addition, courts have concluded that Hill–Burton was intended to expand the availability of uncompensated care to indigent people:

[T]he legislative history of the Hill–Burton Act, both in its origins and as it has evolved through amendment, indicates that it was intended to be more than a construction statute.... [T]he records of the Senate hearings demonstrate that

---

**15.** Under the 1987 regulations, the first stage of the review process is for "substantial noncompliance," where a facility must satisfy four criteria: (1) have in place a system for providing notice to persons eligible for uncompensated care; (2) comply with the reporting requirements; (3) maintain all required records; and (4) have complied with any previous instructions by the agency to take corrective action. 42 C.F.R. § 124.512(c) (1990). If the facility fails to satisfy any of the above four criteria, the Secretary may disallow all credit for its Hill–Burton program for the entire assessment period. *Id.*

If the facility satisfies these four criteria, the review process moves on to the "substantial compliance" stage. HHS' Motion as to First Amended Complaint, SOF, at para. 25 (Deposition of Sherman Lee, Program Director at the Public Health Service, 38:7–9). HHS selects ten accounts from the facility's patient logs and reviews them for various compliance criteria, including whether the facility made determinations of eligibility within the time prescribed by 42 C.F.R. § 124.507 (1990). *Id.* (Deposition of Lynn Wegman, Deputy Director of Facilities Compliance at HHS, at 50–51). If the facility, in two of the ten accounts, has not made a timely eligibility determination, corrective action will be prescribed, which may include an order to refund any improper collections and ordering the facility to comply in the future. *See id.* Corrective action does not include a disallowance of credit. *See id.* (Wegman Depo. at 65:2–10). Credit will be disallowed only if the facility fails to abide by the prospective action. *Id.*

There appears to be a conflict among representatives of HHS as to the amount of credit a facility loses if it fails to comply with the two-day rule as part of a corrective action plan. According to Ms. Wegman, a subsequent violation of the timely determination requirements would result in "zero credit." *Id.* (Wegman Depo. at 65:7–22). Mr. Lee, on the other hand, states that credit is deducted according to a formula based on the facility's rate of error. *Id.* (Lee Depo. at 37). This is not an insignificant contradiction. The amount of credit a facility may lose directly affects its "incentive" for compliance. Disallowing all credit clearly provides a greater incentive to comply with the Act's regulations. In addition, it appears to be more appropriate given that a facility already has been given an opportunity to correct its deficiencies and has, according to the subsequent audit, failed to do so. Disallowance of credit on the rate of error is perhaps more appropriate in a situation where a substantial, if not all, of the patients' files are audited.

the provision of medical services to indigents was a recurrent theme. *American Hosp. Ass'n v. Schweiker*, 721 F.2d at 176; *Euresti*, 458 F.2d at 1118 ("[T]he legislative history and the expressed purposes of Congress indicate that the Act was passed to ensure that the indigent would be supplied sufficient hospital services when needed."). Finally, plaintiffs claim that "HHS has provided no reasonable rationale justifying its departure from prior policy." *Id.* at 14.

Plaintiffs' argument that the substantial compliance standard is inconsistent with Hill–Burton appears to be premised on its belief that (1) the new standard allows hospitals to use their Hill–Burton obligation to write off "bad debts" by allowing hospitals "to take credit for care they would have provided anyway" and (2) the allowance of such credit unambiguously conflicts with congressional intent underlying the Hill–Burton Act. Plaintiffs' Cross–Motion, at 9.

■ Congress no doubt intended that facilities receive credit for medical services provided to those persons *unable* to pay; not for those *unwilling* to pay. Therefore, plaintiffs' argument is valid to the extent that facilities credit "bad debts" incurred by *non* indigent patients. Crediting bad debts incurred by nonindigent patients would surely be inconsistent with Hill–Burton's statutory assurances that services be provided only to those "unable to pay."[16] Plaintiffs' concern that certain patients may refrain from seeking medical services because of uncertainty as to who will pay for the care is well-taken. Still, the fact remains that regardless of when the eligibility determination is made, a hospital may only credit the amount from patients "unable" to pay.

The two-day eligibility determinations rule has always permitted the write off of "bad debts" from those who are unable to pay. Although most patients, except for those in need of emergency treatment, probably seek a determination of their Hill–Burton eligibility prior to the rendering of services, the regulations provide that a request for uncompensated care may be made at any time, including after a collection action is initiated. 42 C.F.R. § 124.-502(k) (1990) (defining "request for uncompensated services").[17]

Thus, plaintiffs' concern that elimination of the two-day eligibility determination rule will allow facilities to write off "bad debts" is unfounded for it is clear that only the "bad debts" of indigent patients may be credited to a hospital's Hill–Burton obligation. The court is convinced that Hill–Burton's statutory assurances to provide "a reasonable volume of services to persons unable to pay therefor" is satisfied in situations where patients, after the fact, are found to be indigent, thereby qualifying for Hill–Burton services.

However, it should be noted that the court expects that these situations will be extremely rare. In most instances, the two-day rule should apply, especially in circumstances where patients might refrain from seeking care because they are unsure about their duty to pay for the care. At this point, the only situation the court can envision in which more than two-days is necessary to determine eligibility is where the patient, after being provided with emer-

**16.** Plaintiffs' reliance *Corum v. Beth Israel Medical Center*, 373 F.Supp. 550 (S.D.N.Y.1974) is unpersuasive. The *Corum* Court, like plaintiffs, was concerned that "bad debts" incurred by ineligible patients could be credited towards a hospital's Hill–Burton obligation. *Id.* at 557. However, the regulation in *Corum*, like the one before the court, prohibited such accounting because a hospital could only credit those "bad debts" from patients who were "unable" to pay. *Id.; see* 42 C.F.R. § 53.111 (1978). In addition, the *Corum* Court's concern that many indigent persons may incur liabilities and be discouraged from seeking medical care "on the ground that by the time of billing its [Hill–Burton] require-

ment has been satisfied" is well taken for it is clear that many patients will be deterred if they are unsure about their duty to pay. Still, this concern appears to be addressed by the current regulation, as it was by the 1979 regulation, that requires a two-day eligibility determination for any preservice request. 42 C.F.R. § 124.-507(c)(1).

**17.** The current regulations still provide for a two-day eligibility determination for a request "made before receipt of outpatient services or before discharge for inpatient services." 42 C.F.R. § 124.507(c) (1990).

gency treatment, is discharged before making a request for uncompensated services.[18] In that situation, the regulations provide that an eligibility determination must be made within the "first full billing cycle" following the request. 42 C.F.R. § 124.-507(c)(2)(1990).

In short, the court is persuaded that the substantial compliance regulations, under the *Chevron* standard of deference, are consistent with the objectives of the Hill–Burton Act. It seems fairly clear that Congress intended to delegate to HHS the authority to render the subject regulations of the Hill–Burton Act. It also seems clear that the 1987 regulations are not inconsistent with the Act and that the Secretary made a reasonable determination that the substantial compliance standard presents a significant incentive for a facilities to operate their Hill–Burton program in conformity with the regulations.

### B. The 1988 "Interpretative" Change

In 1988, HHS implemented an "interpretative change" that retroactively revoked the effect of the 1979 rule. *See* 53 Fed. Reg. 44,954–56 (Nov. 7, 1988). The 1988 interpretative change only applies to actions by facilities prior to February 1988. *See id.* at 44,955. Under the 1988 interpretative change, HHS reinstated credit to all facilities denied credit between 1980 and 1988 for failing to give timely determinations. *Id.* at 44,956. This change resulted in reinstating a total of $31 million to facilities nationwide. Plaintiffs' Cross–Motion, SOF, at para. 26 (Exhibit M).

Plaintiffs argue that reinstating credit retroactively imposes an illegal rule[19] and that by reinstating credit, HHS is illegally reducing facilities' uncompensated care obligations by allowing facilities to fulfill those obligations in violation of the statutory assurance to *expand* the availability of uncompensated care. Plaintiffs' Cross–Motion, at 18.

Interpretative rules are not subject to the notice and comment requirements specified in the Administrative Procedure Act ("APA"). 5 U.S.C. § 553(b)(A); *Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir. 1980). Interpretative rules "merely clarify or explain existing law or regulations." *Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir.1983). They describe an agency's view of the meaning of an existing statutory or regulatory term. *Southern Cal. Edison Co. v. F.E.R.C.,* 770 F.2d 779, 783 (9th Cir.1985); *Batterton,* 648 F.2d at 705. Interpretative rules, by definition, do not have the force of law. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). They are not binding on the agency, private parties, or the courts:

> Thus an interpretative rule does not have the force of law and is not binding on anyone, including the courts, though the status conferred on an agency as the delegate of Congress and by its expertise often leads courts to defer to the agency's interpretation of its governing statute.

*National Latino Media Coalition v. F.C.C.,* 816 F.2d 785, 788 (D.C.Cir.1987) (citation omitted); *Joseph v. United States Civil Service Commission,* 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977) ("Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise. A court should not inadvertently grant an agency rule the binding effect of a legislative rule simply for the purpose of avoiding an exemption from the notice and comment procedures of section 553.").

Although it was not adequately briefed by the parties, there is some question as to what degree of deference should be accorded to interpretative rules. Since interpretative rules are not binding on anyone, it would seem that applying the deference specified in *Chevron* would require

---

**18.** In a situation where a patient makes a request for uncompensated services while he or she is receiving inpatient services, but is discharged before the two-day period expires, it is

expected that the facility will make the eligibility determination within two days.

**19.** This argument is addressed in § IVC below.

the court to accept the interpretative rules absent a showing of unreasonableness. Under this approach, interpretative rules would become virtually indistinguishable from legislative rules.

Yet, note that if the *Chevron* deference standard is applied, HHS, as a practical matter, would be able to bind the court and the public with rules that do not bind the agency itself and that are exempt from the notice and comment procedures required by the APA. *See* 5 U.S.C. § 553; *Community Nutrition Institute v. Young*, 818 F.2d 943, 953 (D.C.Cir.1987) (Starr, J., concurring in part and dissenting in part). Absent a clear indication from Congress or the Supreme Court, the court is unwilling to apply the *Chevron* deference standard to the subject interpretative rules. This court's unwillingness to apply the *Chevron* deference standard is supported by Supreme Court precedent. For example, in *Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), the Supreme Court stated:

> [A] court is not required to give effect to an interpretative regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise. *See ... Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164 89 L.Ed. 124 (1944).

432 U.S. at 425 n. 9, 97 S.Ct. at 2405–06 n. 9; *see also General Motors Corp. v. Ruckelshaus*, 724 F.2d 979, 984–85 n. 30 (D.C.Cir.1983) ("A court always has the power to substitute its judgment for that of the agency in the case of an interpretative rule, even though courts customarily accord some measure of deference to an agency's interpretation of a statute for which it has been assigned the responsibility of enforcement."), *aff'd in part on rehearing*, 742 F.2d 1561 (1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *Joseph*, 554 F.2d at 1154 n. 26 (same).

Since interpretative rules are not binding on anyone, they, unlike legislative rules, should not be given controlling significance. In other words, when legislative rules are not involved, "administrative interpretations of statutory terms are given important but not controlling significance." *Batterton v. Francis*, 432 U.S. at 424, 97 S.Ct. at 2405. The deference given in this situation was expressed by the Supreme Court in *Skidmore, supra*, where the Court stated:

> [W]hile not controlling upon the courts ... [agency interpretations] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140, 65 S.Ct. at 164; *accord General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976).

▮ The court is persuaded that the 1988 interpretative rules as they relate to the reinstatement of credit are inconsistent with HHS' past interpretations. HHS' consideration of the interpretative rules appears to be less than thorough and the validity of its reasoning is questionable. As support for the reasoning underlying the reinstatement rule, HHS asserts the substantial compliance regulations and a district court decision from the District of Minnesota.

Contrary to HHS' assertion, the 1987 regulations have not "rendered moot for most purposes the two-working-day requirement. The two-day eligibility determination period is still a factor to be considered in determining whether to grant or deny credit. The substantial compliance scheme does not alter a facility's obligation to make timely determinations.[20] *See* 42

---

**20.** Indeed, under the substantial compliance standard, a facility that fails to comply with the two-day eligibility rule will be subject to correc-

tive action and, if necessary, disallowance of all credit for the subject fiscal year. *See* HHS'

C.F.R. § 124.507(c)(1990). It has merely been deemphasized insofar as a two-day determination is no longer required in a situation where a patient is discharged before making a request for uncompensated services, and failure to comply with this provision will no longer result in the automatic denial of credit. Deemphasizing the significance of the two-day provision is an insufficient basis for reinstating credit. A rule that, in effect, denies indigent people $31 million in medical care serves no purpose other than to frustrate congressional intent which is, as noted earlier, to provide medical services to indigent people. *American Hosp. Ass'n v. Schweiker*, 721 F.2d at 176–77.

Further, HHS' reliance on *Douglas County* is misplaced because, as noted earlier, that case is limited to a situation where a facility has a valid reason to seek a brief delay. *Douglas County* had nothing to do with whether credit should be reinstated to all facilities, no matter what the length of time or the reason for the delay. Moreover, *Douglas County* was reviewing a regulation under a higher standard of deference than the instant interpretative rule.

In short, the 1988 interpretative rule insofar as it relates to the reinstatement of credit does not fare well under the *Skidmore* standard of deference. The interpretative rule is inconsistent with legislative intent underlying Hill–Burton and prior Hill–Burton interpretations. The reasoning advanced by HHS demonstrates that its consideration of the interpretative rules was less than thorough.

## IV. *Administrative Procedure Act*

Plaintiffs claim the 1987 and 1988 changes violate the APA on two grounds. First, they argue that because the changes conflict with due process standards, HHS has violated the APA. Second, plaintiffs argue that HHS violated the APA by failing to proceed by rulemaking when promulgating the 1988 "interpretative change" which revoked retroactively the 1979 two-day rule.

Motion as to First Amended Complaint, SOF, at

## A. Due Process

■ To assert a due process claim, plaintiffs must demonstrate a protectible property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). "[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709; *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Federal constitutional law determines whether the interest asserted rises to the level of a legitimate claim of entitlement protected by the due process clause. *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1314 (9th Cir.1984).

■ Under Hill–Burton, a patient who meets objective financial criteria is eligible for uncompensated medical care. A patient's right to receive services is contingent upon whether the hospital has met its annual uncompensated services obligation, 42 C.F.R. § 124.503(a) (1990), as well as the particular hospital's allocation plan and whether the applicant has other medical coverage. *See* 42 C.F.R. § 124.505(a)(1) & 124.506 (1990).

In *Newsom v. Vanderbilt University*, 653 F.2d 1100 (6th Cir.1981), the Sixth Circuit concluded that Hill–Burton "did not require any particular allocation scheme nor is there any legislative history to indicate that Congress thought the Hill–Burton recipients would be providing free care for all that needed it." *Id.* at 1120. The court went on to find that given that the need for indigent care was greater than the resources of the hospital, "no individual has a legitimate claim to free services such that the procedures provided in the present case infringe a due process right." *Id.* at 1121.

In contrast, the Seventh Circuit, in *Davis, supra*, held that indigent patients

paras. 25 and 26.

have due process rights with regard to Hill–Burton eligibility determinations. "This enforceable interest comports with the practical side of due process since it is conditional upon controverted or controvertible facts." *Davis*, 640 F.2d at 43. Unlike *Newsom*, the *Davis* court held that Hill–Burton applicants need not have *actual* entitlements to Hill–Burton services to have due process rights in the procedures surrounding eligibility determinations. *Id.; see also Ressler v. Pierce*, 692 F.2d 1212, 1214–17 (9th Cir.1982) (*applicants* for federally subsidized housing had due process rights in waiting list procedure). In finding that Hill–Burton applicants have an enforceable interest in compliance by facilities, the *Davis* court stated:

> [T]he regulations appear to anticipate that granting an application will be the usual course, perhaps because the customary level of compliance is set high enough to ensure that most applicants will receive services. Accordingly, claimants will ordinarily have to demonstrate only their eligibility; in the uncommon case, the facility may perhaps seek thereafter to show exhaustion of its yearly compliance requirement or financial strain.

640 F.2d at 42–43 (footnote omitted).

HHS criticizes the *Davis* decision, stating that it "is based on the faulty assumption that the granting of an application for Hill–Burton uncompensated services will be the 'usual course, perhaps because the customary level of compliance is set high enough to ensure that most applicants will receive services.'" HHS' Motion as to First Amended Complaint, at 15 (quoting *Davis*, 640 F.2d at 42–43). Citing *Newsom*, HHS argues that the "legislative history of the Hill–Burton Act indicates that Congress recognized that the need for free services was greater than the provisions the Act created." *Id.* As support for their argument, HHS points out that Flagstaff Medical Center satisfied its entire multi-year obligation in only seven weeks. HHS' Mo-

tion as to First Amended Complaint, Exhibit 1 at 2.

While the isolated example of FMC is persuasive, the court nevertheless is convinced that the rate at which a hospital fulfills its Hill–Burton obligation is separate from whether plaintiffs have an enforceable due process interest in receiving uncompensated care.[21] Since the regulations allow a hospital to develop its own allocation plan, *see* 42 C.F.R. § 124.506 (1990), thereby determining the rate at which it fulfills its Hill–Burton obligation, it makes little sense to tie a hospital's allocation plan to whether indigent patients have an enforceable due process right. As the *Davis* court explained, although claimants need only establish financial eligibility, "the facility may perhaps seek thereafter to show exhaustion of its yearly compliance requirement...." 640 F.2d at 43.

That on which *Davis* rested was not the assumption that *most* people would receive services. Rather, it was that even though Hill–Burton uncompensated care is distributed on a first-come, first-serve basis, as long as the care is available, Hill–Burton applicants have due process rights because the eligibility determination depends on the application of objective criteria. *See Eidson v. Pierce*, 745 F.2d 453, 461–62 (7th Cir.1984) (acknowledging that Hill–Burton applicants have due process rights based on objective eligibility criteria, even though the ultimate entitlement is allocated on a first-come, first serve basis). Further, congressional recognition of a private right of action, 42 U.S.C. § 300s–6, by Hill–Burton applicants to effectuate compliance also supports the conclusion that Hill–Burton applicants have an enforceable interest for due process purposes. The private right of action is intended to secure a certain benefit and support a claim of entitlement for Hill–Burton applicants. In short, the court's review of the case law and legislative history concerning Hill–Burton and the existence of a private right of action leads

---

**21.** Arguably, the fact that HHS reinstated nationwide $31 million in uncompensated medical care supports the *Davis'* Court's conclusion that granting the Hill–Burton application will be the

"usual course, *perhaps* because the customary level of compliance is set high enough to ensure that most applicants will receive services." 640 F.2d at 42 (emphasis supplied).

it to conclude that plaintiffs have due process rights to Hill–Burton benefits.[22]

### B. Due Process and the 1987 Regulations [23]

■ Having concluded that plaintiffs have a due process claim to Hill–Burton benefits, the next issue is whether the 1987 regulations violate the due process clause.[24] Under the APA, any agency action that is contrary to a constitutional right is invalid. 5 U.S.C. § 706(2)(B); *see also Shaker Medical Center Hosp. v. Secretary of Health and Human Services*, 686 F.2d 1203, 1207 (6th Cir.1982). Although due process claims often involve securing a specific process for determining eligibility, due process also requires that whatever process is used must be *timely* when programs of "last resort" are involved. *See Goldberg v. Kelly*, 397 U.S. 254, 264–66, 90 S.Ct. 1011, 1018–1020, 25 L.Ed.2d 287 (1970); *Like v. Carter*, 448 F.2d 798, 804 (8th Cir.1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972). In addition, when an agency delegates responsibilities, it must ensure that procedural requirements and constitutional standards are met. *See Crosby v. Young*, 512 F.Supp. 1363, 1382–83 (E.D.Mich.1981) (when E.P.A. delegated environmental review responsibilities to local governments, E.P.A. was still required to make sure procedural and constitutional standards were applied); *National Center for Preservation Law v. Landrieu*, 496 F.Supp. 716, 731 (D.S.C.1980), *aff'd.*, 635 F.2d 324 (4th Cir.1980) (same).

Plaintiffs argue that the "substantial compliance" standard violates the APA and the due process clause of the fifth amendment. They claim that Hill–Burton applicants have due process rights to prompt eligibility determinations and that denial of credit where facilities fail to make timely eligibility determinations is necessary to ensure that Hill–Burton applicants receive prompt, eligibility determinations. Plaintiffs' Cross–Motion, at 23–24. Delay in processing applications for public benefits, according to plaintiffs, may be deemed the equivalent of denying individuals an opportunity to be heard upon their claimed right, and therefore, constitutes a denial of due process. *Id.* at 19–20.

Plaintiffs apply the three-part test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) to argue that Hill–Burton applicants have a due process right to a prompt eligibility determination and to a procedure that ensures that they will actually obtain timely determinations. Plaintiffs' Cross–Motion, at 26. According to plaintiffs, the due process procedures required in this case dictate that facilities "be prohibited from claiming credit for care where the facilities' own delays have the effect of denying eligible applicants access to needed services to which they are entitled." Plaintiffs' Reply, at 14–15.

■ Based on the discussion in the previous section, where the court concluded that indigent patients have due process rights to Hill–Burton benefits, the court has little difficulty concluding that those due process rights include a right to a prompt eligibility determination. Medical care under Hill–Burton, like the welfare assistance at issue in *Goldberg*, is a pro-

---

**22.** Aside from *Newsom*, much of the case law either suggests or expressly indicates that indigent patients are entitled to Hill–Burton benefits, albeit on a first-come, first serve basis. *See, e.g., Corum*, 373 F.Supp. at 556–57; *Cook v. Ochsner Found. Hosp.*, 319 F.Supp. 603 (E.D.La. 1970); *Gordon v. Forsyth County Hosp. Auth.*, 409 F.Supp. 708 (M.D.N.C.1976); *Davis*, 640 F.2d at 43; *American Hospital Ass'n v. Schweiker*, 721 F.2d at 176–78.

**23.** Plaintiffs asserted a due process claim under the APA and the fifth and fourteenth amendments of the United States Constitution. The following discussion applies to all of plaintiffs' due process claims as they relate to the 1987 regulations.

**24.** In light of the court's conclusion with respect to the 1988 interpretive rule, see §§ IIIB and IVC, the court sees no need to address plaintiffs' due process claim concerning the 1988 rule. This is consistent with the long-standing principle "that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988); *Three Affiliated Tribes v. Wold Engineering*, 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984).

gram of "last resort" aimed at those persons living on the margins of society.[25] While in *Goldberg* the terminations of welfare assistance pending resolution of a controversy over eligibility deprived an eligible recipient "of the very means by which to live while he waits," 397 U.S. at 264, 90 S.Ct. at 1018, so, too, will a delay in determining eligibility deprive a person of the very means by which he or she lives for there is no doubt that health care is a basic necessity of life.[26] "Prompt action by the state is crucial in the medical assistance program ... because even retroactive payment may not be fully remedial for the delays and 'delay beyond the time limits may ... impose lingering, if not irreversible, hardships upon recipients.'" *Kessler v. Blum,* 591 F.Supp. 1013, 1032 (S.D.N.Y.1984) (quoting *Smith v. Miller,* 665 F.2d 172, 177 (7th Cir.1981)).

The 1987 regulations contain specific requirements about the timing of eligibility requirements:

(c) *Timing of determinations* —(1) *Preservice determinations.* (i) Facilities other than nursing homes shall make a determination of eligibility within two working days following a request for uncompensated services which is made before receipt of outpatient services or before discharge for inpatient services;

(2) *Postservice determinations.* All facilities shall make a determination of eligibility not later than the end of the first full billing cycle following a request for uncompensated services which is made after receipt of outpatient services, discharge for inpatient services, or admission for nursing home services.

42 C.F.R. § 124.507(c)(1)(2) (1990). The 1987 regulations retained the two-day requirement for requests for services made *before* admission or treatment. For those applicants who request uncompensated services prior to receiving medical care, the hospital must make a determination within two working days. In situations where the applicant requests uncompensated services after receipt of out-patient services or after he or she is discharged for inpatient services, the facility must make a determination no later than the first full billing cycle following the applicant's request.

The court is persuaded that the 1987 regulations do not deprive Hill–Burton applicants of timely eligibility determinations. The current timing requirements will not discourage indigent patients from obtaining needed medical care nor will the requirements serve as a de facto denial pending the eligibility determination. In most instances, the notice requirements, *see* 42 C.F.R. § 124.504 (1990), will insure that patients receive notice of a hospital's Hill–Burton obligation. Except for emergency situations, most patients should receive their eligibility determination within two working days, assuming they request a determination of eligibility prior to the rendering of services or before being discharged. Arguably, the only situation where a facility may have more than two days (i.e., one full billing cycle) to determine eligibility is where the patient, after being provided with emergency treatment, is discharged before making a request for uncompensated services. If a patient requests uncompensated care while he or she is receiving inpatient services, but is discharged before the two-day period expires, the facility should still make the eligibility determination within two days. Although the regulations allow one full billing cycle for requests for uncompensated care made after receipt of outpatient services or discharge for inpatient services, the regulations' notice provisions make such requests unlikely since most patients, except those in emergency situations, probably will seek an eligibility determination prior to receiving medical care.

Plaintiffs' assertion that disallowance of credit is the only adequate procedure to

---

**25.** For example, in general only patients who do not qualify for any other public assistance program may obtain Hill–Burton care. 42 C.F.R. § 124.505(a)(1) (1990).

**26.** Although the Court believes that health care, as a basic necessity of life, should not be rationed on the basis of a patient's ability to pay, the provision of such care obviously is an issue that must be dealt with by Congress and the States.

safeguard their due process rights is unpersuasive. First, as indicated earlier, this court cannot say, under the *Chevron* standard of deference, that the 1987 regulations are inconsistent with Hill–Burton. Hill–Burton provided the Secretary with broad authority to render regulations dealing with the issues in this case. Second, the court is unpersuaded that only disallowance of credit on an account-by-account basis is the only procedure adequate to satisfy due process. There is no reason to expect that Hill–Burton facilities will not comply with the eligibility determination requirements.

Finally, if the essential interest involved here is, as plaintiffs claim, access to medical care, it seems to matter little whether eligibility is determined within two days or the first full billing cycle after the services are provided.[27] If the applicant has already received the medical care, it is difficult to see how waiting one full billing cycle would result in the erroneous deprivation of a substantive interest. Indeed, if the applicant has already received medical care, there is nothing the applicant or, for that matter, the facility can do with respect to the result of the eligibility determination, regardless of whether the determination is made within two working days. Plaintiffs' argument would be more persuasive if applicants were forced to wait one full billing cycle *before* obtaining medical care.

Still, plaintiffs' argument is valid to the extent that applicants must wait more than two days before obtaining medical care. However, absent any showing that Hill–Burton facilities have or will not comply with the current two-day rule, the court does believe that plaintiffs' due process rights have been violated.[28] In short, the court is convinced that the 1987 regulations' timing requirements and the substantial compliance standard are consistent with the dictates of due process.

**C. The 1988 "Interpretative" Change: Legislative Rule or Interpretative Rule**

The APA requires that agencies proceed by notice and comment when promulgating rule changes. 5 U.S.C. § 553(b). An agency is subject to the APA's notice and comment requirements if the rules it seeks to adopt are substantive or legislative in nature. Substantive rules are those that "'grant rights, impose obligations, or produce other significant effects on private interests,'" *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987), or "effect a change in existing law or policy." *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984) (quoting *Powderly*, 704 F.2d at 1098); *Seldovia*, 904 F.2d at 1347. "The rights, conduct, obligations, and interests affected by legislative, binding rules cover a broad range." *Batterton*, 648 F.2d at 702 n. 30 (citations omitted).

The APA broadly defines "rules" because the "essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Id.* at 703. The Administrative Procedure Act defines a rule as follows:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]

---

**27.** This, of course, assumes that a request was not made until after the patient was discharged for inpatient services.

**28.** It may be that at some future point plaintiffs may be able to establish a significant or systematic disregard of the two-day rule by hospitals. However, until such a showing is made, the court is unwilling to find a due process violation based on the assumption that the two-day rule will be violated.

5 U.S.C. § 551(4). The breadth of this definition cannot be understated. This definition makes it clear that the APA "broadly defines an agency rule to include nearly every statement an agency may make[.]" *Batterton*, 648 F.2d at 700. The APA further defines "rulemaking" to mean "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

■ In order to give the public an opportunity to participate in the rule-making process, the APA, in addition to broadly defining "rule," carves out only limited exceptions to the notice and comment requirements. *Batterton*, 648 F.2d at 704. Exemptions from the APA's notice and comment requirements are recognized in the limited situations involving "interpretative rules, general statements of policy or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A); *Batterton*, 648 F.2d at 700–01.[29] These exceptions must be applied narrowly and only reluctantly countenanced. *Alcaraz v. Block*, 746 F.2d at 612.

In contrast to substantive rules, interpretative rules "merely clarify or explain existing law or regulations." *Powderly*, 704 F.2d at 1098. They describe an agency's view concerning the meaning of an existing statutory or regulatory term. *Southern Cal. Edison Co.*, 770 F.2d at 783; *Batterton*, 648 F.2d at 705. "An interpretative rule serves an advisory function explaining the meaning given by the agency to a particular word or phrase in a statute or rule it administers." *Batterton*, 648 F.2d at 705. Similarly, a "rule[ ] of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton*, 648 F.2d at 707 (citations omitted).

■ This court

would be less than candid if [it] pretended that the labels of "legislative" and "non-binding" rules neatly place particular agency actions within any particular category. Instead, the categories have "fuzzy perimeters" and establish "no general formula." The wouldbe cataloguer may be confounded by the wide variation in kinds of agency action, and the diverse contexts of regulatory fields.

*Id.* at 702–03 (citations omitted).[30] "A time-honored principle of administrative law is that the label an agency puts on its action 'is not necessarily conclusive.'" *San Diego Air Sports Center, Inc. v. F.A.A.*, 887 F.2d 966, 970 (9th Cir.1989) (quoting *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942)). Reviewing courts often examine the process by which an agency result is achieved rather than the result itself. *Id.*

■ Plaintiffs argue that "HHS' 1988 decision to revoke the 1979 rule by giving back credit to facilities that had failed to provide Hill–Burton eligible patients timely determinations is a 'substantive' change directly affecting Hill–Burton applicants' eligibility for uncompensated care." Plaintiffs' Cross–Motion, at 29–30. As a substantive rule, HHS was required to follow the notice and comment procedures of the APA.

HHS asserts that the 1988 rule was interpretative and therefore notice and opportunity for comment was not required. HHS' Motion, at 15. According to HHS,

Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise. A court should not inadvertently grant an agency rule the binding effect of a legislative rule simply for the purpose of avoiding an exemption from the notice and comment procedures of section 553.

554 F.2d at 1154 n. 26 (citations omitted).

---

**29.** The notice and comment requirements also are not required "where the need for public participation is overcome by good cause to suspend [them]." *Batterton*, 648 F.2d at 704; 5 U.S.C. § 553(b)(3)(B); 5 U.S.C. § 553(d)(3).

**30.** See also *Joseph, supra,* where the D.C. Circuit stated:

Classification of a rule as legislative has implications beyond the conclusion that section 553 notice and comment procedures apply. Legislative rules have the full force of law....

the 1988 rule "*only* modified the effect of noncompliance with the two-day eligibility determination rule.... HHS merely chose to no longer enforce the two-day rule by denying Hill–Burton credit when the facility failed to comply with the rule." *Id.* at 17–18. Alternatively, HHS argues that the challenged rule is a statement of agency procedure and practice and therefore exempt from the notice and comment requirements. *Id.* at 20.

Although the notice accompanying the 1988 rule states that it was a "change in the Department's approach to assessing the compliance of facilities," 53 Fed.Reg. 44,954 (Nov. 7, 1988), the practical effect—and indeed plaintiffs' primary concern—of the rule is to reinstate $31 million in uncompensated care that otherwise would have been available. The substantial compliance regulations, which were implemented prior to the 1988 rule, established that HHS was no longer going to deny credit automatically for failure to comply with the two-day rule. Indeed, HHS' argument appears to support the 1987 substantial compliance regulations more than the 1988 rule. It was through the 1987 regulations, which the court has already determined to be valid, that HHS no longer chose to automatically deny credit when a facility did not comply with the two-day rule.

In light of the principle that exemptions to § 553 must be narrowly construed and only reluctantly countenanced, *Alcaraz, supra,* the court is persuaded that the challenged rule is not interpretative within the meaning of the APA. The challenged rule does more than describe HHS' view of the meaning of an existing statutory or regulatory term. It produces significant effects on private interests and imposes obligations. It creates an immediate, substantive rule by making a determination as to a facility's particular Hill–Burton obligation. As plaintiffs stated, the 1988 rule change will "produce a significantly detrimental effect on indigent patients' interests in obtaining uncompensated services in the fu-

ture." Plaintiffs' Cross–Motion, at 30. A rule that has resulted in the loss of $31 million that otherwise would have been available in the form of uncompensated services to indigent patients is hardly explanatory of a statute or regulation.

The challenged rule, to the extent it relates to the substantial compliance regulations, imposes obligations. Under the challenged rule, facilities that had not been assessed under the previous regulations would be required to develop and implement procedures consistent with the new regulations in order to obtain Hill–Burton credit. *Cf. American Hosp. v. Harris,* 625 F.2d 1328, 1330–31 (plaintiff hospital association sought to have 1979 regulations enjoined on grounds, *inter alia,* that they would force hospitals to rearrange its medical staffs and organizational policies and raise administrative costs of compliance); *Wyoming Hosp. Ass'n v. Harris,* 527 F.Supp. 551 (D.Wyo.1981) (plaintiff hospital association sought to show, as a matter of contract law, that they were not bound by the obligations imposed by new regulations), *aff'd.* 727 F.2d 936 (1984). Those facilities whose procedures were initially geared towards satisfying the two-day rule would, under the challenged rule, have the additional obligation of implementing procedures consistent with the substantial compliance standard.[31] Those hospitals who were subject to the 1979 regulations, and had not yet been audited under those regulations would, under the 1988 rule, be subject to a different standard that, according to HHS, no longer skews the "incentive for compliance toward some regulatory requirements and away from other others." 52 Fed.Reg. 46,023 (Dec. 3, 1987). When HHS determined that facilities that had not yet been audited were exempt from the 1979 regulatory requirements (i.e., the two-day rule), HHS clearly intended to promulgate a rule with the full force of law. A determination concerning the obligation of particular facilities or whether the facilities are exempt from the 1979 regulations are not matters requiring either clarification of

---

**31.** HHS itself determined that the account-based approach (i.e., the two-day rule) "skewed the incentive for compliance toward some regula-

tory requirements and away from others." 52 Fed.Reg. 46,023 (Dec. 3, 1987).

statutory language or a public indication of how HHS will exercise discretionary power. If HHS exempts certain facilities from compliance with the 1979 regulations and/or determines the obligation of certain facilities, that obligation is binding on plaintiffs, the hospitals, and the court. The 1988 rule, to the extent that facilities may no longer be denied credit for failure to comply with the two-day eligibility determination rule, is determinative of issues or rights. It is more than a general statement of policy; it is binding on all facilities and potential Hill–Burton applicants. Although facilities may not object, especially if they have credit reinstated, to being bound to the 1988 rule, the fact remains that this so-called interpretative rule has resulted in the reinstatement of $31 million in uncompensated care that otherwise would have been available to indigent patients.

The challenged rule also effects a change in existing law or policy in that it is " 'implementary to an existing law.' " *Alcaraz,* 746 F.2d at 613, (quoting *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir. 1952)). The 1988 rule implements Hill–Burton's uncompensated care assurances by altering how the substantial compliance regulations will be applied and who will be subject to them. The substantial compliance regulations impose general, extra statutory obligations in an attempt to encourage agencies to comply with all the regulations, not just the two-day rule. By reinstating credit and no longer denying credit for noncompliance with the two-day rule, HHS, in effect, implemented a substantive rule that, in conjunction with the 1987 regulations, changed the previous policy of denying credit whenever a facility did not comply with the two-day rule.

Further, where potential eligibility to public programs has been altered, the change is substantive rather than administrative. *See Batterton,* 648 F.2d at 704–06 (Department of Labor change in the method for calculating unemployment statistics is substantive change because it would directly affect whether particular recipients would receive CETA emergency job training monies); *Aiken v. Obledo,* 442 F.Supp.

628, 649 (E.D.Cal.1977) (change in approval procedures for food stamp applicants is a substantive change because it would directly alter which applicants would receive benefits); *Vance v. Hegstrom,* 793 F.2d 1018, 1023 (9th Cir.1986) (HHS change in method for determining income available to Medicaid applicants is substantive change because it altered eligibility criteria). Here, the 1988 rule, which implements the substantial compliance regulations, affects an applicant's eligibility in that his or her eligibility is directly tied to a facility's outstanding obligation. By reinstating $31 million in uncompensated care, the facilities' obligation was reduced dramatically. The effect on potential indigent patients is clear. Equally clear is the necessity to give indigent patients an opportunity to be heard on what is, no doubt, a significant impact.

Finally, the challenged rule is not interpretative because it has a "future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). "Interpretative rules ... are not within the definition of § 551(4) of the APA because interpretative rules do not have future effect as that term is used in § 551(4), and are not binding on the courts." *Energy Consumers and Producers Association, Inc. v. Dept. of Energy,* 632 F.2d 129, 139 (Temp.Emer.Ct.App.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980). As indicated earlier, the 1988 rule, by implementing the 1987 regulations, is binding on all facilities and potential indigent applicants. By altering and/or implementing the substantial compliance regulations, the 1988 rule, through the reinstatement of credit, has prospectively determined the amount of uncompensated care available to indigent persons. Although an interpretative rule may have some future effect, the effect of the subject rule is clearly beyond any incidental effect contemplated by the APA and the narrow construction given to exceptions under the APA. The challenged rule is binding on all parties and its effect is both substantive and prospective. As such, it is subject to

the notice and comment procedures of the APA.

It should also be noted that HHS provided no record of the "process" that resulted in the 1988 interpretive rule. HHS admits that it did not rely on any studies or research that analyzed the impact of the rule on indigent patients' access to uncompensated medical services when it developed the rule. Plaintiffs' Cross–Motion, Exhibit M, at 71. HHS also has not provided good cause to overcome the need for public participation by indigent clients who were not given the opportunity to highlight the impact of the rule or even suggest alternatives to public hearings.

### Mazon Plaintiffs v. Flagstaff Medical Center

Plaintiffs allege that Flagstaff Medical Center ("FMC") violated the Hill–Burton Act and its regulations by refusing to operate a Hill–Burton program after 1980, thereby failing to provide plaintiffs with Hill–Burton uncompensated care. Plaintiffs' Motion for Partial Summary Judgment Against Defendant Flagstaff Medical Center and Flagstaff Health Management Corporation ("Plaintiffs' Motion as to FMC"), at 2. Plaintiffs move for summary judgment on various claims. They claim that FMC has breached its contract with plaintiffs, violated their due process rights, and the Arizona Consumer Fraud Act (A.R.S. § 44–1521 et seq.). Flagstaff filed a cross-motion for summary judgment, arguing that plaintiffs' state law claims are preempted by the Hill–Burton Act and that any violations of Hill–Burton that may have occurred were cured by a settlement agreement between HHS and Flagstaff. FMC's Opposition to Motion for Summary

Judgment and FMC's Cross Motion for Summary Judgment ("FMC Cross–Motion"), at 28–35. Alternatively, FMC argues that it did not commit consumer fraud and that any breach of contract that may have occurred has been fully remedied. *Id.* at 37–39 & 35.

### V. *Hill–Burton Claim*

Plaintiffs assert that FMC violated the Hill–Burton regulations in 1980 and thus did not fulfill completely its obligation to provide uncompensated care. Plaintiffs' Motion as to FMC, at 5. In support of its request, plaintiffs rely on FMC's admission that it violated several of the regulations implementing Hill–Burton, Plaintiffs' Motion as to FMC, SOF, at paras. 11, 14, 15, 21 and 26, and HHS' determination that FMC violated various Hill–Burton obligations.[32] Plaintiffs' Motion as to FMC, at 6. Plaintiffs further argue that Hill–Burton requires FMC to remedy fully its violations of the Act.[33] *Id.* at 7.

FMC responds by arguing that any violation of the Hill–Burton regulations it may be liable for has been cured by HHS' subsequent determination that FMC successfully fulfilled its Hill–Burton obligation. FMC's Cross–Motion, at 30–34. FMC appears to base its response on two factors. The first is the 1988 "interpretative" rule which resulted in HHS conducting a reassessment of FMC's fiscal year 1980 Hill–Burton program in July 1989. *Id.* at 31. "As a result of [HHS'] reassessment, rather than being denied credit for all of the free care in Fiscal Year 1980, as [HHS] had previously determined, FMC was certified as having provided $41,547 in uncompensat-

**32.** Between December 10, 1980, and March 12, 1990, FMC did not have in place a Hill–Burton program because FMC believed it did not have any outstanding Hill–Burton obligation. Plaintiffs' Motion as to FMC, SOF, at para. 17.

**33.** To remedy FMC's violations, plaintiffs request the court to:

1) order FMC to make refunds to persons who made payment to FMC but who were in fact eligible for free care; 2) order FMC to reinstitute its program at a dollar amount that does not give it credit (a) for violations of the

two-day written determination requirement, ... and (b) for care given to members of plaintiff class; 3) order FMC permanently to cease collection efforts, by FMC or its collection agencies against persons who were eligible for Hill–Burton care between December 10, 1980 and March 12, 1990, and not take credit for this care; and 4) order FMC to remove any FMC debt from the credit reports of persons eligible for Hill–Burton care between December 10, 1980 and March 12, 1990. Plaintiffs' Motion as to FMC, at 7–8.

ed services during Fiscal Year 1980." *Id.* at 31.

The second factor relied on by FMC is a settlement agreement it entered into with HHS that dismissed FMC's declaratory judgment action. On January 22, 1990, pursuant to a settlement agreement, FMC and HHS filed a Stipulation and Final Order of Dismissal with prejudice of *FMC v. Sullivan*, (CIV No. 88–1881), the lead case in this consolidated matter. The court entered the Order of Dismissal on January 30, 1990.

The settlement agreement required FMC to provide $382,763.00 in uncompensated services during fiscal year 1990 in order to satisfy its remaining Hill–Burton obligation. *Id.* at 31–32. On April 2, 1990, FMC made an Offer of Judgment to plaintiffs, the terms of which were the same as the settlement with HHS. Plaintiffs' Motion as to FMC, at 3. Plaintiffs rejected the offer because it did not remedy fully FMC's violations. *Id.*

■ As a threshold issue, the court must determine whether the settlement agreement cures any of FMC's alleged Hill–Burton violations. FMC argues that "[b]ecause FMC fulfilled its uncompensated services obligation, and likewise the terms of the settlement agreement, HHS determined that the settlement agreement superseded the previous findings of noncompliance...." [34] FMC's Cross–Motion, at 32. According to FMC, since the settlement agreement "superseded the previous findings of noncompliance," the agreement should be accorded deference as a final agency determination. *Id.* at 32–33.

Contrary to FMC's assertion, the settlement agreement is not a final administra-

tive decision. It did not require HHS to issue an interpretation of Hill–Burton law nor was it entered into pursuant to the Administrative Procedure Act. The agreement did not result from an "agency adjudication" or "proceeding." *See* 5 U.S.C. § 551(7) & (12). Under these circumstances, the court will not accord deference to "findings" that were not arrived at pursuant to the requirements of the APA.

■ The court also finds it difficult to accord any deference because at the time the settlement agreement was reached, both FMC and HHS were defendants in the suit filed by plaintiffs (CIV No. 89–0576). This lawsuit was consolidated with the action between FMC and HHS (CIV No. 88–1881), the lead case in this matter. Despite the fact that plaintiffs were a party as a result of the consolidation, and FMC and HHS were both defendants in the action filed by plaintiffs, neither FMC nor HHS included plaintiffs in the settlement negotiations. As plaintiffs stated, "[i]f the settlement contemplated resolution of plaintiffs' claims against FMC, Plaintiffs should have been represented in the negotiations, and should have consented to the final agreement." Plaintiffs' Reply as to FMC, at 10. Furthermore, resolution of plaintiffs' claims must be approved by the court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.[35] Under Rule 23(e), a class action may not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise must be given in such manner as the court directs. *Norman v. McKee*, 431 F.2d 769, 774 (9th Cir.1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d

---

**34.** In its cross-motion, FMC also argues that the settlement agreement cures its alleged Hill–Burton violations with respect to three individual claimants. In addition to finding that FMC had not complied with Hill–Burton's implementing regulations in effect in 1980, HHS issued findings that FMC had violated the Hill–Burton regulations with respect to three individual claimants. In a February, 1988, letter, HHS ordered "FMC or its agents [to] stop immediately all efforts to collect payments from these patients and reimburse them for any improper collections." FMC's Cross–Motion, SOF, at para. 17.

**35.** FMC asserts that "Plaintiffs' contention that this Court must approve the HHS/FMC settlement is not supportable." FMC's Reply, at 9–10. The court's understanding of plaintiffs' contention is not as FMC asserts. Rather, the court understands plaintiffs' argument to be that any resolution of plaintiffs' claims must be accomplished pursuant to Rule 23(e) and that if the instant settlement agreement purported to settle any of plaintiffs' claims, it would have needed the court's approval.

811 (1971) [36]; *see also Euresti,* 458 F.2d at 1117 n. 3 (In addressing appellee's observation that named plaintiff Euresti had received assistance from hospital, court noted—in a case involving the Hill–Burton Act—that since suit was brought as a class action it could not be settled or compromised unless the trial court finds that such a disposition is in the interest of the whole class.). Rather than curing FMC's violations, the settlement agreement appears to represent a compromise between FMC and HHS' interests in litigation. It does not resolve a compromise between plaintiff class and FMC and/or HHS.

With respect to the other factor (1988 interpretive rule) relied on by FMC, the court, in previous sections of this order, invalidated the rule for failure to comply with the notice and comment requirements of the APA, and for being inconsistent with Hill–Burton. *See supra* at §§ IIIB and IVC. Moreover, FMC did not explain adequately how the 1988 rule, even if valid, cures any previous finding of non-compliance with the Hill–Burton regulations. On its own, this factor only partially cures FMC's Hill–Burton violations and, even in conjunction with the settlement agreement, it is doubtful that it remedies fully plain-

tiffs' claims, especially in light of the previous discussion concerning the settlement agreement.

As to the merits of plaintiffs' motion for partial summary judgment, FMC based its entire response to plaintiffs' claim concerning FMC's alleged violation of the Hill–Burton Act on the settlement agreement. FMC adduced no other facts, and did not attempt to argue that a material issue of fact precluded summary judgment on plaintiffs' claim that FMC violated the Hill–Burton regulations in 1980 and thus did not fulfill completely its obligation to provide uncompensated care. *See* FMC's Cross–Motion, Statement of Facts and Reply Brief. Thus the court has no choice but to grant summary judgment in plaintiffs' favor on the issue of whether FMC violated the Hill–Burton regulations in 1980. *See* Plaintiffs' Motion as to FMC, at 5–7; Plaintiffs' SOF as to FMC, especially at paras. 9–15, 18, 19, 21–24, 26 and 31.

With regard to whether Hill–Burton requires FMC to remedy fully its violations of the Act, FMC again relies on the settlement agreement and provides no facts or argument controverting plaintiffs' requested remedy.[37] *See* FMC's Cross–Motion,

36. "The reason for the requirement is obvious. Because the rights of many persons are at stake who are parties to the action only through their representative, a settlement negotiated between the named parties may not give due regard to the interests of those unnamed." *Norman,* 431 F.2d at 774. Here, FMC and HHS did not even include plaintiffs in the settlement, let alone give their interests "due regard."

37. On July 29, 1991, Flagstaff brought to the court's attention a decision from the Middle District of Pennsylvania, *White v. Moses Taylor Hospital,* 763 F.Supp. 776 (M.D.Pa.1991), finding, among other things, that Hill–Burton does not allow for a personal remedy, and that state law claims are preempted by Hill–Burton. The court has carefully reviewed the decision and declines to follow it for the reasons discussed in this section and sections VI and VIA.

It is unclear how the *White* Court's conclusion holding that Hill–Burton does not allow for a personal remedy, 763 F.Supp. at 782–83, applies in that *White* involved only one plaintiff and this case involves a class action. In any event, the *White* Court's conclusion seems to be at odds with the Secretary's authority to utilize "any action authorized by law to secure compliance." 42 C.F.R. § 124.512(a) (1990); *see supra*

at n. 41. Further, it makes little sense to give an indigent patient a private right of action to secure compliance and then not allow that patient to obtain personal relief. In part, it was Hill–Burton's history of compliance problems that caused Congress to add a private right of action in 1975. *See American Hosp. Ass'n v. Schweiker,* 721 F.2d at 174. The incentive for an indigent patient to bring an action to effectuate compliance would no doubt be diminished if he or she could not obtain personal relief. Whereas the public interest for a person who seeks to enforce, for example, an environmental statute is clear, the same cannot be said for an indigent patient; an indigent patient, by definition does not have the resources to pursue a cause for the "public interest." The indigent patient is not concerned with achieving pollution free waterways, but rather, with obtaining a basic necessity of life. Unlike the environmentalist, the indigent patient does not have the luxury, let alone the ability, to contemplate the public interest. Moreover, not allowing an indigent patient to seek personal relief is inconsistent with the notion that indigent patients have due process rights to Hill–Burton benefits on a first-come, first-serve basis. *See Davis,* 640 F.2d at 42–43 & *supra* at §§ IVA & B. Finally, the current regulations require a facility that

Statement of Facts and Reply Brief. Again, the court has no choice but to grant plaintiffs' motion for summary judgment on the issue of whether Hill–Burton requires FMC to remedy fully its violations. *See* Plaintiffs' Motion, at 7–11.

## VI. *State Law Claims*

 Plaintiffs assert three state law claims—breach of contract, RICO, and the Arizona Consumer Fraud Act—against FMC. FMC argues that the Hill–Burton Act provides a comprehensive remedial scheme that preempts any actions other than those intended to effectuate compliance. *See* FMC's Cross–Motion, at 1–30. FMC further argues that under the Hill–Burton Act, the only available remedy may not exceed anything beyond effectuating compliance. *See id.* at 15–18. FMC exhaustively discusses the Act's legislative background and the case law interpreting the Act to argue that all of plaintiffs' state law claims are preempted.

FMC, despite its extensive discussion, neglected to mention the Court's Order of January 30, 1990 ("Court's Order"), which addressed many of the issues addressed in FMC's motion. Even assuming, as FMC asserts, that the Court's Order "seems to invite further argument on the question of what remedies are available to Plaintiffs," FMC's Reply, at 2, it is clear that FMC was being less than candid when it failed to mention the Court's Order in its cross-motion.

In any event, the court sees no reason to revisit the issues dealt with by the Court's Order of January 30, 1990. FMC has added nothing that would cause the court to alter its original conclusions. The arguments it presents in its cross-motion for summary judgment appear, for the most part, to be a rehash, albeit a rather extensive one, of those it presented in its previous motion to dismiss.[38]

However, in the interest of thoroughness, the court will briefly discuss the conclusions contained in its Order of January 30, 1990, as well as address any refinements in the arguments raised in FMC's current motion. In the Court's Order of January 30, 1990, this court basically concluded that the Hill–Burton statute and the case law involving pendent claims neither explicitly nor implicitly preempts plaintiffs' state law claims. *See* Court's Order of January 30, 1990. As to plaintiffs' breach of contract claim, which is premised upon third-party beneficiary theory, the court stated that it "simply cannot conclude that the language of the Hill–Burton statute is so specific as to indicate a Congressional intent to completely exclude third-party beneficiary claims." *Id.* at 5. The court also concluded that the breach of contract claim was not preempted by any federal remedy on the ground that "federal courts have consistently upheld third-party beneficiary actions based on contracts which incorporate federal statutory requirements." *Id.* at 6 (citations omitted). The court went on to conclude that while it was "unwilling to conclude once and for all that compensatory damages are an appropriate remedy in

---

has denied uncompensated services to any person because it failed to comply with any of the requirements of this subpart will not be in compliance with its assurance until it takes *whatever steps are necessary to remedy fully* the noncompliance, including:

(1) Provision of uncompensated services to applicants improperly denied;

(2) Repayment of amounts improperly collected from persons eligible to receive uncompensated services[.]

42 C.F.R. § 124.512(b)(1) & (2) (1990). If an indigent person who has been denied uncompensated services files a suit as a "private attorney general," that person is entitled to the same remedies available to the Secretary. Indeed, he or she is entitled to "whatever steps are necessary to remedy fully the noncompliance." *Id.*

Since the allegations of noncompliance will necessarily be based on the complaint of the indigent person, it is difficult to imagine any other remedy but that relating to the indigent person. In other words, since noncompliance is the basis for the person's claim seeking personal relief, the only way to "remedy fully the noncompliance" is to provide that person with his or her personal remedy.

**38.** Although FMC's current motion does not present anything that would cause the court to reevaluate its previous conclusions, the motion did develop some of the subtleties of FMC's arguments more clearly. Where appropriate, the court will address the refinements in FMC's arguments below.

a case of this nature, the *Court does conclude without hesitation that exercising jurisdiction over the Class' pendent contract claims is appropriate.*" *Id.* at 7 (emphasis supplied).

With regard to plaintiffs' state RICO and Consumer Fraud Claims, the court determined that it could exercise jurisdiction over the claims:

> The alleged violations of the "Hill–Burton" Act form the basis of both the federal and state claims. A substantial number of facts to be proven under the "Hill–Burton" claim are central to the Class' pendent claims. [footnote omitted].
>
> These claims appear to be such that both federal and state claims could be tried together. The Court appears to have power to exercise jurisdiction over the state RICO and Consumer Fraud claim.

*Id.* at 9–10.

In the pleadings currently before the court, FMC argues that when Congress amended Hill–Burton in 1975 by creating a private right of action, it intended to limit "the type of action that could be brought to one 'to enforce compliance' by 'means authorized by existing law'...." FMC's Reply, at 6. According to FMC, by allowing "means authorized by existing law," Congress intended "to define and freeze judicial remedies to existing categories of federal law only and to preclude their expansion, whether by means of state-law causes of action or otherwise...." *Id.* In effect, FMC argues that since the case law at the time of the 1975 amendment did not allow claims beyond those relating to effectuating compliance with Hill–Burton, the court should not allow plaintiffs' state law claims to proceed.

Despite the refinement in FMC's argument, the court does not find FMC's argument persuasive. Contrary to FMC's assertion, the legislative history suggests that Congress would favor state law claims

if they would result in a facility being forced to comply with the Act's regulations. As this court previously stated, "a variety of theories might be employed to persuade a court to effectuate compliance." Court's Order, at 5. Indeed, widespread noncompliance by many hospitals existed to such a great extent that, in 1974, the Senate Committee on Labor and Public Welfare, in reviewing the Hill–Burton enforcement experience, concluded that federal and state agency compliance efforts reflected a "sorry performance." S.Rep. No. 1285, 93d Cong., 2d Sess. 61, *reprinted* in 1974 U.S.CODE CONG. & ADMIN.NEWS 7842, 7900. In response to this "sorry performance," Congress enacted a new federal assistance program for health care facility construction and modernization that added teeth to the Hill–Burton Act's requirements. This Act, which added Title XVI to the Public Health Service Act, 42 U.S.C. §§ 300q, *et seq.*, grants the Secretary of Health and Human Services extensive investigative and enforcement powers for facilities assisted under both Title VI and Title XVI of the Public Health Service Act. Congress' addition of a private right of action in 1975 is consistent with its desire to improve upon the "sorry performance" and strengthen Hill–Burton's enforcement provisions. Similarly, the allowance of state law claims is consistent with congressional intent to improve compliance on the part of facilities.

In addition, the language of the enforcement provision, 42 U.S.C. § 300s–6, which was discussed in the Court's Order of January 30, 1990, and the regulations implementing the statute, do not appear to preclude state law claims. The relevant regulatory provision provides:

> (a) If the Secretary [39] finds, based on his/her investigation ... that a facility did not comply with the requirements of this subpart, the Secretary may take any action authorized by law to secure compliance, including but not limited to, voluntary agreement or a request to the

---

**39.** Before filing a civil action, a person must first file a complaint with Secretary. The civil action may not be pursued unless the Secretary dismisses the complaint or the Attorney General has not brought a civil action within six months from the date on which the complaint is filed with the Secretary. 42 C.F.R. § 124.511(a)(4) (1990).

Attorney General to bring an action against the facility for specific performance.

42 C.F.R. § 124.512(a) (1990). There is no indication in the 1990 regulations that "authorized by law" is only limited to the law in place at the time of the 1975 amendment. Indeed, such an interpretation appears to be unreasonable; if the statute were limited to the existing law at the time of the 1975 amendment, the Secretary would be unable to respond to changing circumstances and conditions. Limiting the Secretary's flexibility to implement Hill–Burton would surely affect his/her ability to "effect compliance." Also, the language in the regulation, "including but not limited to," is the standard language utilized to leave open potential alternatives or interpretations of a statute or regulation.[40]

This language certainly leaves open the possibility that state law claims may be utilized to secure compliance. Finally, the Secretary's response to comments concerning the role of the States in enforcing Hill–Burton indicates that Hill–Burton did not intend to preclude state law claims:

> [A] provision has also been added to clarify that these regulations do not supersede independent remedies available to States under State law. See § 124.-512(d). Thus, States are free to impose additional requirements and to make available additional legal remedies, so long as the Secretary's right to enforce the requirements of these regulations is not impeded.

44 Fed.Reg. 29,396 (May 18, 1979).[41]

FMC relies on *Still v. Michaels*, 166 Ariz. 403, 803 P.2d 124 (App.1990), to argue that

**40.** In an analogous situation involving statutory definitions, it has been stated that:

> "the word 'includes' is usually a term of enlargement, and not of limitation.... It therefore conveys the conclusion that there are other items includable, though not specifically enumerated ...."

Sands, 2A *Statutes and Statutory Construction* § 47.07, at 133 (1984) (quoting *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir.1968)).

**41.** The court is unpersuaded by the *White* Court's conclusion that allowing state causes of action sanction a plaintiff's circumvention of the administrative procedure and would thereby prevent the Secretary from the Hill–Burton Program. *Id.* at 790. The *White* Court did not acknowledge the Secretary's own statement that Hill–Burton was not intended to supersede independent remedies available to States under State law. *See* 44 Fed.Reg. 29,396 (May 18, 1979). Nor does it appear that the Court addressed adequately the regulatory provision which provides that "the Secretary may take *any action authorized by law* to secure compliance." 42 C.F.R. § 124.512(a) (1990) (emphasis added). Indeed, it appears that the *White* Court's conclusion that a person acts as a "private attorney general" when he or she brings a private action, 763 F.Supp. at 783, is difficult to reconcile with its conclusion that Hill–Burton preempts state law claims if, as the regulations provide, the Secretary may "take any action authorized by law."

The court is also convinced, based on its review of the legislative history, that allowing state law claims is consistent with congressional intent to improve compliance with the Hill–Burton assurances. Allowing state law claims will not be an obstacle to accomplishing the objectives of Congress. *See also infra* § VIA

(discussion relating to *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 28–29, 97 S.Ct. 2490, 2493, 53 L.Ed.2d 557 (1977)). Rather, a facility that is potentially subject to a remedy that goes beyond its Hill–Burton obligation is more likely to comply with the Act's assurances than a facility that is subject merely to a remedy that cannot exceed the obligation it already owes under the Hill–Burton Program. Indeed, the instant case illustrates why state claims potentially could serve as a greater incentive for facilities to comply with Hill–Burton. Here, HHS ordered Flagstaff to reopen its Hill–Burton program on July 22, 1982. Plaintiffs' Motion as to FMC, SOF, at para. 12. On October 10, 1984, FMC filed an administrative appeal, and on January 23, 1985, HHS denied the appeal. *Id.* at Exhibits 7 & 9. On February 18, 1988, HHS again ruled that FMC violated the Hill–Burton regulations, and ordered it to provide uncompensated care to five applicants. *Id.* at Exhibit 11. FMC did not seek judicial review, the only legal recourse available, until November 4, 1988. FMC finally reinstituted its Hill–Burton program as part of its settlement with HHS. *Id.* at Exhibit 17. Despite orders from HHS, FMC, for whatever reason(s), did not implement its Hill–Burton program between 1982–1990. Notwithstanding FMC's reasons for not implementing its program, the fact remains that when it finally did implement its program, it was only obligated to fulfill its Hill–Burton obligation; an obligation that should have been provided years earlier. Thus, for nearly a decade indigent patients in Flagstaff's service area were denied a basic necessity. It is conceivable that, had the potential remedy exceeded Flagstaff's statutorily mandated obligation, the class of indigent patients might not have been denied access to health care for such an extended period.

Arizona court would not extend state statutory and common law to incorporate an action based upon Hill–Burton. FMC's Cross–Motion, at 26–28. Reading the *Still* case, as FMC suggests, requires a considerable leap of faith. The *Still* case, contrary to FMC's assertion, does not stand for the proposition that Arizona courts are unwilling to interpret state causes of action to incorporate violations of federal law. Rather, the case is a straightforward discussion concerning the issue of whether the Federal Communications Act ("FCA") preempts a state law claim based on private nuisance theory. Because the level of radio frequency interference was specifically regulated by the FCA, the *Still* Court found that state regulation would present a clear conflict with congressional intent. *Id.* 803 P.2d at 125. Here, the court already has determined that the Hill–Burton Act is not so specific as to indicate a congressional intent to exclude state law claims. Further, the court has concluded that state claims would be consistent with congressional intent to improve compliance with the Hill–Burton program. *See also supra* at § VI.

In short, the court is convinced that the Hill–Burton Act's remedial provisions do not preempt plaintiffs' remedies based on state law claims. As the court previously concluded, plaintiffs alleged violations of the Hill–Burton Act form the basis for both the federal and state claims, i.e., there is a common nucleus of operative facts between plaintiffs' federal and state claims. Also, this conclusion is supported by the reasons discussed in § VIA below.

### A. Breach of Contract

Plaintiffs argue that "[s]ince members of the plaintiff class are the intended beneficiaries of the contract between FMC and HHS, they are entitled to damages for breach of that contract." Plaintiffs' Motion as to FMC, at 14. Defendants make two arguments in response to plaintiffs' contract claim. First, they argue that the contract claim is preempted by the Hill–Burton Act's comprehensive enforcement scheme. FMC's Cross–Motion, at 34. This

argument was addressed earlier. *See supra* at § VI.

Second, FMC argues that any breach of contract has been fully remedied by the settlement agreement it reached with HHS. *Id.* at 35–36. According to FMC, "HHS, a party to the contract, has determined that FMC's obligations have been completely fulfilled. It stands to reason that if HHS is satisfied that FMC's contractual obligations have been fulfilled, Plaintiffs have no valid claim to a remedy on their breach of contract theory." *Id.* at 36.

"A third party intended beneficiary is found where recognition of the right to performance in the beneficiary is appropriate to effectuate the intention of the parties, and the circumstances indicate that the promisee intended to give the beneficiary the benefit of the promised performance." *Supplies for Industry, Inc. v. Christensen*, 135 Ariz. 107, 659 P.2d 660, 662 (App.1983) (citing Restatement (Second) of Contracts § 302 (1982)). A third-party beneficiary may only enforce his/her rights under a contract to the same extent as if he/she had personally entered into and assented to the agreement. *Suciu v. AMFAC Distributing Corp.*, 138 Ariz. 514, 675 P.2d 1333, 1338 (App.1983); Restatement (Second) of Contracts § 309, comment b ("Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."); 17A *Am.Jur.2d* "Contracts" § 459, at 481 (1991) ("The rights of a third-party beneficiary are measured by the terms of the contract between the promisor and promisee, and such rights are no greater than those of the promisee under the contract."). However, the duty to an intended beneficiary may not be discharged if the third-party, before receiving notice of the release, materially changes his/her position in reliance on the contract, or brings suit on the contract. *Supplies for Industry, Inc.*, 659 P.2d at 662; Restatement (Second) of Contracts § 311 (1981); *see also Corbin on Contracts* § 815 (1951). The contractual rights of third-party beneficiaries are matters of interpretation, and therefore, constitute a question of law.

*Matter of Estate of Levine,* 145 Ariz. 185, 700 P.2d 883, 887 (App.1985).

■ Federal courts have consistently upheld third-party beneficiary actions based on contracts that incorporate federal statutory requirements. *See Miree v. DeKalb County, Georgia,* 433 U.S. 25, 28–29, 97 S.Ct. 2490, 2493, 53 L.Ed.2d 557 (1977); *Holbrook v. Pitt,* 643 F.2d 1261, 1271–73 (7th Cir.1981). Medical facilities that receive Hill–Burton benefits enter into a contractual relationship with the United States. *Euresti,* 458 F.2d at 1118–119; *Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 912–13 (S.D.N.Y.1973); *Wyoming Hosp. Ass'n v. Harris,* 527 F.Supp. at 554. Indigent patients have third-party beneficiary rights arising from a facility's contract with HHS. *Euresti,* 458 F.2d at 1118–1119 ("appellants are the intended beneficiaries of the Federal obligation sought to be enforced"); *Hospital Center at Orange v. Cook,* 177 N.J.Super. 289, 299–300, 426 A.2d 526, 531–32 (1981); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F.Supp. 268, 271 (S.D.Fla.1971); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603, 605–606 (E.D.La.1970); *see Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–35 (5th Cir. 1974) (following *Euresti* on private remedy issue). Plaintiffs' contractual rights as third-party beneficiaries derive from FMC's statutory Hill–Burton obligations.[42] *See Euresti,* 458 F.2d at 1118–1119; *Wyoming Hosp. Ass'n,* 527 F.Supp. at 557–58.

■ FMC argues that its contractual obligations have been completely fulfilled by the settlement agreement. According to Flagstaff, HHS, as a party to the con-

tract, "determined that FMC's obligations have been completely fulfilled." FMC's Cross–Motion, at 36. This argument might be more persuasive if the settlement agreement had been entered into before plaintiffs filed their action. However, the duty to an intended beneficiary cannot be discharged if the third party, before receiving notice of the release, materially changes his or her position in reliance on the contract, or brings suit on the contract. *Supplies for Industry, Inc.,* 659 P.2d at 662; Restatement (Second) of Contract § 311 (1981). After plaintiffs filed suit, FMC could not evade its obligations simply by entering into a settlement that excluded plaintiffs. Therefore, contrary to FMC's assertion, the settlement agreement does not cure its obligations under the contract.

In response to plaintiffs' breach of contract claim, FMC argued only that the settlement agreement between it and HHS cured its contractual obligations. FMC's Cross–Motion, at 35–36. FMC, as it did with its response to plaintiffs' claim that FMC violated the Hill–Burton regulations, adduced no facts, and did not attempt to argue that a material issue of fact precluded summary judgment on plaintiffs' breach of contract claim. Consequently, having determined that the settlement agreement cannot fulfill FMC's contractual obligations, and because FMC provided no facts to controvert plaintiffs' breach of contract claim, the court will grant summary judgment in favor of plaintiffs on the breach of contract claim.

Except for the request for attorneys' fees, the remedy requested by plaintiffs is virtually identical to the remedy granted in the previous section dealing with FMC's Hill–Burton violations. *See* Plaintiffs' Mo-

---

**42.** Indeed, before Congress granted indigent patients a private right of action, it was generally held that indigent patients had an implied civil remedy, in part, on the ground that they had third-party beneficiary rights arising from a facility's contract with the government. *See Saine* 502 F.2d at 1034–35; *Euresti,* 458 F.2d at 1118–1119; *Organized Migrants in Community Action, Inc.,* 325 F.Supp. at 271; *Cook,* 319 F.Supp. at 605–606. There have been relatively few cases addressing third-party claims since the addition of the private cause of action. *See, e.g., Hospital Center at Orange,* 117 N.J.Super. at 299–300, 426 A.2d at 531–32 (following *Euresti's* reasoning that indigent clients are intended beneficiaries); *Wyoming Hosp. Ass'n,* 527 F.Supp. at 554–57; *Braun v. Ada County,* 102 Idaho 901, 905, 643 P.2d 1071, 1075 (1982) (Shepard, J., dissenting). This is probably because there is no longer any need to imply a private right of action. The court finds unpersuasive FMC's contention that the addition of a private remedy eliminated plaintiffs' third-party claims. Congress' addition of a private remedy seems to strengthen, and perhaps codify, an indigent patient's third-party beneficiary rights.

tion as to FMC, at 7 and 14–15. The issue of whether to allow attorneys' fees pursuant to A.R.S. § 12–341.01(A) turns on whether federal common law or state law applies to the contract. In *Miree v. De-Kalb County, Georgia, supra,* petitioners sought to impose liability as third-party beneficiaries of a contract between DeKalb County and the Federal Aviation Administration ("FAA"). Petitioners asserted that DeKalb County breached its contract with the FAA, causing the crash of a Lear jet. 433 U.S. at 26–27, 97 S.Ct. at 2492–93. In holding that state law should govern petitioners' third-party breach of contract claim, the Supreme Court stated:

> The litigation before us raises no question regarding the liability of the United States or the responsibilities of the United States under the contracts. The relevant inquiry is a narrow one: whether petitioners as third-party beneficiaries of the contracts have standing to sue respondent. While federal common law may govern even in diversity cases where a uniform national rule is necessary to further the interests of the Federal Government, the application of federal common law to resolve the issues presented here would promote no federal interests....

*Id.* at 28–29, 97 S.Ct. at 2493 (citation omitted). The *Miree* Court allowed the third-party breach of contract claim despite the "fact that the United States has a substantial interest in regulating aircraft travel and promoting air travel safety...." *Id.* at 31, 97 S.Ct. at 2495.

Similarly, this court sees no reason why state law should not apply to plaintiffs' breach of contract claim. Plaintiffs' breach of contract claim against FMC raises no question regarding the liability of HHS or HHS' responsibilities under the contract. The resolution of plaintiffs' breach of contract claim against FMC will have no direct effect upon HHS or the United States Treasury. *See id.* at 29, 97 S.Ct. at 2494. Nor will HHS' "substantial interest" in regulating and enforcing the Hill–Burton Act be affected by plaintiffs' claim. Indeed, to the extent that any sub-

stantial interest of HHS is involved, plaintiffs' breach of contract claim advances that interest by inducing compliance with Hill–Burton's regulations. As the *Miree* Court stated in the FAA context:

> The question of whether private parties may, as third-party beneficiaries, sue a municipality for breach of the FAA contracts involves this federal interest only insofar as such lawsuits might be thought to advance federal aviation policy by inducing compliance with FAA safety provisions.

*Id.* at 32, 97 S.Ct. at 2495. Since state law provides for attorneys' fees in a breach of contract action, A.R.S. § 12–341.01(A), the court will allow plaintiffs to file an application for attorneys' fees.

**B. Arizona Consumer Fraud Act**

The Arizona Consumer Fraud Act ("ACFA") declares unlawful the:

> act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely ... in connection with the sale or advertisement of any merchandise...."

A.R.S. § 44–1522(A) (West 1987). The Arizona Supreme Court has determined that the ACFA provides a private right of action by persons damaged by practices declared to be unlawful under the ACFA. *Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 521 P.2d 1119, 1122 (1974). The purpose of the ACFA is to root out and eliminate unlawful practices in merchant-consumer transactions. *State ex rel. Corbin v. Hovatter,* 144 Ariz. 430, 698 P.2d 225, 226 (App.1985); *Madsen v. Western American Mortg. Co.,* 143 Ariz. 614, 694 P.2d 1228, 1232 (App.1985). In order to establish a violation of the ACFA, the injured consumer must show "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Dunlap v. Jimmy GMC of Tucson, Inc.,* 136 Ariz. 338, 666 P.2d 83, 87 (App.1983). It is not necessary to show specific intent to deceive; the intent to do

the act involved is sufficient. *State ex rel. Babbitt v. Goodyear Tire and Rubber Co.,* 128 Ariz. 483, 626 P.2d 1115, 1118 (App. 1981). In addition, before a private party may exert a claim under the ACFA, he/she "must have been damaged by the prohibited practice. A prerequisite to such damages is reliance on the unlawful acts." *Peery v. Hansen,* 120 Ariz. 266, 585 P.2d 574, 577 (App.1978).

Plaintiffs allege that FMC committed consumer fraud by concealing its Hill–Burton obligation, omitting to inform persons of the availability of Hill–Burton benefits, pursuing collection of plaintiffs' alleged debts, and actually collecting payments. Plaintiffs' Motion as to FMC, at 15. In particular, plaintiffs assert that FMC concealed material facts when it informed persons inquiring about Hill–Burton care that it had no such obligation. Plaintiffs' Motion as to FMC, at 17. Second, plaintiffs allege that "since FMC had an affirmative duty to provide plaintiffs with individual written notices, make written determinations of eligibility and provide uncompensated care, 42 C.F.R. § 124.505, 124.506, 124.508 (1979), its refusal to do so constitutes deception under the Consumer Fraud Act." *Id.* Third, plaintiffs allege that FMC, under false pretenses, attempted to bill persons who were eligible for Hill–Burton care. *Id.* Fourth, FMC's receipt of $1,242.50 in payments from named plaintiffs "constitutes deception, collecting money under false pretenses, and the concealment and omission of material facts in violation" of the ACFA. *Id.* Finally, plaintiffs assert that FMC's failure to reopen its Hill–Burton program despite its admission that it had an outstanding obligation of approximately $20–26,000 constitutes concealment, misrepresentation, and false pretense in violation of the ACFA. *Id.* at 17–18.

Although the court previously concluded that plaintiffs' state law claims are not preempted by Hill–Burton,[43] the court believes there are material issues of fact as to whether FMC's actions constitute a violation of the ACFA. In particular, it is unclear whether FMC's actions constitute "a false promise or misrepresentation." FMC asserts that it did not reopen its Hill–Burton program because it believed in "good-faith" that it had satisfied its Hill–Burton obligation. For example, a report of a site visit conducted by HHS states "that the absence of posted notices would probably not be a case of non-compliance, since the facility had calculated in good faith that its obligation was completed." FMC's SOF, at Exhibit 5; *see also* FMC's SOF, Exhibit 33 (letter from HHS to FMC stating that in December 1980 FMC "believed in good faith" that it had satisfied its Hill–Burton obligation and that since that time FMC and HHS have been negotiating to resolve the agreement). This court cannot say that there is no issue of fact as to whether FMC's failure to reopen its Hill–Burton program for nearly ten years—despite several HHS administrative decisions contradicting FMC's position—was not justified. *See* FMC's SOF, at paras. 23–26. Even if FMC's failure to reopen its program was unjustified, it still cannot be said that such failure constitutes a violation of the ACFA. Finally, with respect to FMC's failure to reopen its program to fulfill its admitted outstanding obligation of $26,000, it is also disputed whether FMC was justified in not opening the program and, if not, whether such action constitutes a violation of the ACFA. *See id.* at para. 10.

There is also an issue of fact, which neither party addressed, as to whether Hill–Burton services constitute "merchandise" within the meaning of the ACFA. While FMC's collection of payments—if shown to violate the Act—constitute merchandise, *see Schmidt v. American Leasco,* 139 Ariz. 509, 679 P.2d 532 (App.1983) (consumer fraud found by billing recreational vehicle owner for damages which should have been paid by renters), it is unclear whether Hill–Burton services constitute merchandise. Finally, another issue

---

43. FMC responded to plaintiffs' ACFA claim by arguing that the claim is preempted by the Hill–Burton Act. Again, this argument must fail for the reasons discussed previously. *See supra* at § VI.

that was not addressed by the parties is whether Hill–Burton services were made "in connection with the sale or advertisement of any merchandise." A.R.S. § 44–1522(A); *see also* A.R.S. § 44–1521(7).

## CONCLUSION

The seriousness of the current health care crisis cannot be understated. This country clearly is on the verge of a national disaster. "[A]ccess to basic medical care for all of our inhabitants is still not a reality in this country." *Journal of American Medical Association, supra* at 2566. The health care system is plagued by serious distributional inequalities that have made it impossible for a substantial percentage of the population to obtain basic medical care. Reality is defined in terms of the possibilities and, unfortunately, for many people in this country, securing access to basic health care is not a part of their reality.

The instant case or, more particularly, the Hill–Burton Program, does little to improve the current situation; a situation that no doubt must be addressed by the various branches of government. Here, it appears that HHS' 1987 regulations (i.e., implementation of "substantial compliance" standard), under the *Chevron* standard of deference, are consistent with the Hill–Burton Act. In addition, although plaintiffs have due process rights to Hill–Burton benefits and a right to prompt determination of eligibility, plaintiffs have failed to establish that the 1987 regulations conflict with due process standards.

With respect to the 1988 interpretative rule, the court is persuaded that it must be classified as legislative rather than interpretative rulemaking. As such, it is subject to the notice and comment procedures of 5 U.S.C. § 553, and HHS' failure to abide by § 553 requires the rule's invalidation. Even assuming the 1988 rule is "interpretative," the rule must still be struck down because it is inconsistent with the Hill–Burton Act. While the invalida-

tion of the 1988 interpretative rule may appear to be inconsistent with the court's decision upholding the 1987 regulations, note that the inconsistency, to the extent it exists,[44] stems largely from the differing standards of review applied to each administrative action. However, under the circumstances, this court will "not ... grant an agency rule the binding effect of a legislative rule for the purpose of avoiding an exemption from the notice and comment procedures of section 553." *Joseph*, 554 F.2d at 1154 n. 26.

As to the claims between plaintiffs and Flagstaff Medical Center, the court is persuaded that the Hill–Burton Act's remedial and enforcement provisions do not preempt state law claims. In addition, there are no material issues of fact with respect to plaintiffs' Hill–Burton and breach of contract claims. FMC's argument that the settlement agreement satisfies its contractual obligations is unpersuasive, especially when one considers that the agreement was a private one to which class members were given no notice or opportunity to be heard. Contrary to FMC's position, the settlement agreement is not a final administrative decision under which HHS issued an interpretation of Hill–Burton law. At most, the agreement represents a compromise between FMC's and HHS' litigation interests. In addition, even though FMC and HHS were defendants in a pending suit filed by plaintiffs at the time of the settlement negotiations, neither FMC nor HHS bothered to include plaintiffs in the settlement negotiations. Finally, FMC rested its response to plaintiffs' Hill–Burton claim solely on the settlement agreement; it adduced no other facts, nor did it attempt to argue that there was a material issue of fact precluding summary judgment on this claim. Thus, since the settlement agreement does not cure Flagstaff's Hill–Burton violations, summary judgment will be granted on this claim.

With regard to plaintiff's breach of contract claim, Flagstaff responded that the

---

**44.** Arguably, there is no inconsistency in that the 1987 regulations and the 1988 rule are mutually exclusive. That is, the 1988 rule does not

prevent the substantial compliance standard from being implemented. *See* 42 C.F.R. § 124.-511(b)(1) & (2) (1990).

claim is preempted by Hill–Burton. As with the Hill–Burton claim, Flagstaff did not provide any controverting facts or attempt to argue that a material issue of fact precluded summary judgment on plaintiffs' breach of contract claim. Thus, having concluded that plaintiffs' breach of contract claim is not preempted, the court, in light of FMC's failure to offer any controverting facts, will grant judgment on this claim. Also, plaintiffs may file an application for attorneys' fees.

Finally, as to plaintiffs' claim under the Arizona Consumer Fraud Act, there are material issues of fact that preclude the granting of summary judgment.

Based on the foregoing, IT IS ORDERED THAT:

(1) HHS' Motion for Summary Judgment (Doc. # 72) is denied.

(2) HHS' Motion for Summary Judgment as to First Amended Complaint (Doc. # 145) is granted in part and denied in part.

(3) Plaintiffs' Motion for Summary Judgment as to Flagstaff Medical Center (Doc. # 151) is granted in part and denied in part.

(4) Plaintiffs' Motion for Summary Judgment as to HHS (Doc. # 154) is granted in part and denied in part.

(5) Flagstaff Medical Center's Motion for Summary Judgment (Doc. # 172) is denied.

Pursuant to the granting and denial of the various motions for summary judgment, IT IS FURTHER ORDERED THAT:

(1) Plaintiffs' due process claim with respect to the 1987 regulations is dismissed. Plaintiffs' due process claim with respect to the 1988 interpretative change is dismissed without prejudice.

(2) The 1987 regulations are hereby determined to be valid.

(3) The 1988 interpretative change is hereby invalidated. The Secretary of Health and Human Services shall direct Flagstaff Medical Center to provide uncompensated care in the amount equal to all the credit that was reinstated as a result of the 1988 interpretative rule.

(4) All the issues concerning plaintiffs' claims against the Department of Health and Human Services have been determined by this Memorandum and Order. Accordingly, the court, finding no just reason for delay, hereby orders the Clerk of the Court to enter an amended final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure as to all claims between plaintiffs and the Department and Health Human Services.

(5) Summary judgment is granted against Flagstaff Medical Center on Count I (breach of contract) and Count II (violation of the Hill–Burton Act) of plaintiffs' First Amended Complaint. Flagstaff Medical Center shall:

(a) Refund to named plaintiffs all payments made to Flagstaff Medical Center for services rendered since December 10, 1980, plus legal interest;

(b) Publish prominent notices, subject to court approval, inviting persons who received medical services from Flagstaff Medical Center between December 10, 1980 and March 12, 1990, to apply for Hill–Burton benefits;

(c) Refund to persons who were eligible for Hill–Burton care between December 10, 1980 and March 12, 1990, all payments made to Flagstaff Medical Center, and not take credit for this care;

(d) Reinstitute its program at a dollar amount that does not give it credit for violations of the two-day written determination requirement effective during 1980; [45]

(e) Permanently cease collection efforts by it or its collection agencies against persons who were eligible for Hill–Burton care between December 10, 1980 and March 12, 1990, and not take credit for this care;

(f) Ensure that any credit reports of members of plaintiff class are corrected to delete any reference to unpaid bills owed to Flagstaff Medical Center; and

(g) Reinstitute its Hill–Burton uncompensated care program in an amount that does not allow Flagstaff Medical Center to claim credit for uncompensated care

---

**45.** This part of the remedy is in part based on the court's invalidation of the 1988 rule.

given between December 10, 1980 and March 12, 1990.

(6) The court, finding no just reason for delay, hereby orders the Clerk of the Court to enter an amended final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure as to Count I and Count II of plaintiffs' First Amended Complaint.

The court finds that these remedies are necessary to effectuate compliance, 42 U.S.C. § 300s–6, and that they will remedy fully plaintiffs' claims.